**NORTH SHORE LABORATORIES CORP., Plaintiff-Appellant,**

v.

**Harris C. COHEN, Leonard Lyons, Richard Wolf, et al., Defendants-Appellees,**

**The Wonder Seal Co., Intervenor-Appellee.**

**No. 82–1519.**

United States Court of Appeals, Fifth Circuit.

Dec. 22, 1983.

Russell & Nields, Robert B. Russell, Boston, Mass., Graves, Dougherty, Hearon, Moody & Garwood, R. James George, Jr., John J. McKetta, III, Austin, Tex., for plaintiff-appellant.

McGinnis, Lochridge & Kilgore, Patton G. Lochridge, Joe B. Dibrell, Jr., Austin, Tex., for Lucas and Wonder Seal.

Before INGRAHAM, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

North Shore Laboratories Corp. filed application in the district court, asking that defendant William G. Lucas be held in civil contempt for violating the terms of a consent judgment relating to marketing restrictions growing out of an unfair competition claim. The district court denied North Shore's application, concluding that the conduct complained of by North Shore was not proscribed by the consent judgment. We affirm.

### Facts and Proceedings Below

Appellant North Shore Laboratories Corp. manufactures and markets a brown-colored string-type tire repair product under the trade name "Safety Seal."[1] This product is wrapped in blue parchment paper and is shipped and sold in boxes bearing various slogans and illustrations.

North Shore discovered that a business enterprise, Liberty Rubber, headed by William Lucas, was manufacturing and marketing a brown-colored tire repair product under the trade name "Wonder Seal." Its product also was wrapped in blue parchment paper, and was shipped and sold in boxes bearing a strong resemblance to North Shore's Safety Seal product. In 1979, North Shore brought an action against Lucas and others[2] under the Lanham Trade-Mark Act § 43(a), 15 U.S.C. § 1125(a), alleging three counts of false marketing, or "palming off," of a string-type tire repair. The complaint alleged the Wonder Seal product was presented to the public (1) "in a manner tending falsely to lead customers to mistake the product as [North Shore's];" (2) in violation of North Shore's "common law rights by copying [North Shore's] distinctive packaging;" and, (3) falsely representing the characteristics of the product, which, coupled with the alleged palming-off, injured North Shore. Prior to trial, the parties executed a settlement agreement which was incorporated into a consent judgment in March 1979. The judgment in its operative provisions read as follows:

ORDERED, ADJUDGED, and DECREED that Harris C. Cohen, Leonard Lyons, Richard Wolf, William G. Lucas, Randall L. Perry, Agenda Limited, Inc., Consolidated Automotive Manufacturing, Co., and Wonder Seal be and they are hereby restrained and enjoined from selling, manufacturing, accepting orders for, or selling the product attached as Exhibit A to this Judgment, which is the same product as is attached to the Original Complaint in this case as Exhibit 3, and they are further restrained and enjoined from manufacturing, accepting orders for, or selling any product that could reasonably be confused with the product attached as Exhibit B to this Judgment, which is the same product that is attached as Exhibit 9 to the Original Complaint in this case. The foregoing injunction shall not, however, prevent Harris C. Cohen, Richard Wolf, William G. Lucas, Leonard Lyons, Randall L. Perry, Agenda Limited, Inc., Consolidated Automotive Manufacturing Company or Wonder Seal from manufacturing, accepting orders for or selling individually wrapped string type automobile tire repair products of the same size and shape as Exhibit B attached hereto provided that such product or products are not brown, brownish, orange-brown or any other color that could reasonably be confused with said Exhibit B and provided that such product or products are not wrapped in blue, light-blue, greenish-blue or other colored material reasonably likely to be confused with the wrapping on Exhibit B.

---

1. "String type" tire repairs are composed of strands of fiber which are coated with an elastic rubber compound and twisted into a composite cord. They are used to seal punctures in tubeless automobile tires.

2. Of the original defendants, only William G. Lucas is accused of violating the consent judgment.

It is further ORDERED, ADJUDGED and DECREED that Harris C. Cohen, Leonard Lyons, Richard Wolf, William G. Lucas, Randall L. Perry, Agenda Limited, Inc., Consolidated Automotive Manufacturing Co., and Wonder Seal be and they are hereby enjoined and restrained from manufacturing or using the box attached as Exhibit C to this Judgment, which is the same as the box attached as Exhibit 10 to the Original Complaint in this case, for any purpose, and they are further enjoined and restrained from manufacturing or using any box or package for any product which can reasonably be confused with the box that is attached to this Judgment as Exhibit D, which is the same box as Exhibit 2 attached to the Original Complaint in this case. On any package or box, Defendants shall avoid the type size and style which appears on Exhibit D hereto, pictures of Plaintiff's insertion tool, the words "Beware of imitations," the words appearing on the end of Exhibit D attached hereto, the phrase "The one repair that has done it all," the phrase "Manufactured by 'Wonder Seal', Lockhart, Texas, 78644," unless and until such an address is actually an address at which Defendants can be found, and avoid the wording that appears on the press-out thumb panel of Exhibit D attached hereto.

From March 1979, through the end of 1981, appellee Lucas and his company, Liberty Rubber, manufactured and sold only black-colored tire repairs. Lucas then developed a new formula for tire repairs that caused his product to be brown. In December 1981, Ernest Radbill purchased most of the assets of Liberty Rubber and retained Lucas as a consultant. As part of the agreement, Lucas made Radbill the exclusive licensee of the right to manufacture string-type tire repair products with Lucas' new formula, and Radbill agreed to buy all of the chemical products required for tire repair products exclusively from Lucas. Radbill's newly formed company, Motor Industries, now manufactures and sells the Lucas brown-colored tire repair product.[3] As the district court noted, this product is wrapped in white paper and sold in boxes that are easily distinguishable from North Shore's product.[4]

After learning about this product, North Shore filed a motion for an order that Lucas show cause why he should not be held in contempt of the 1979 consent judgment because of his production and sale of the

3. Although Radbill is the present manufacturer and seller of the brown tire repair, Lucas stipulated below for purposes of the contempt hearing that all actions of Motor Industries, Inc. in manufacturing and marketing string-type tire repair products could be deemed to be the actions of Lucas and binding upon him in determining whether he violated the 1979 consent judgment.

4. Motor Industries at present manufactures and markets brown tire repairs under its own trade name "Vulcaseal." It also sells the brown repairs in bulk to various customers who distribute the repair under their individual private labels. North Shore challenges Motor Industries' production and sale of these repairs in a separate action. However, in the present case, North Shore challenges Lucas' production of only two repairs. One is light brown similar in color to North Shore's product and is manufactured for the Patch Rubber Company and the Knick's Mend-Rite Company for sale under their private labels. The other is dark or chocolate brown, almost black in color, and is manufactured for the Wonder Seal Company.

The district court found that the dark brown Wonder Seal product could not possibly be confused with North Shore's product. It focused its analysis on Lucas' manufacture of the light brown repair sold to Patch Rubber and Knick's Mend-Rite. These repairs are packaged distinctively from North Shore's Safety Seal. The individual Safety Seal repairs are wrapped in groups of six in light blue paper that clearly identifies North Shore as the manufacturer. The repairs are then packaged in a comparatively large grey box with orange-red printing that specifies the trade name, the manufacturer, and the manufacturer's location. The Knick's Mend-Rite repair is marketed under the trade name "Sure Seal," and is wrapped in green or white paper which contains no printing, and then packaged in a much smaller multi-colored (orange, black and white) box that clearly identifies the distributor and the name of the product. The Patch Rubber repair is marketed under the trade name "Patch" and is likewise wrapped in green or white paper and packaged in a smaller multi-colored (blue, black and white) box clearly bearing the name Patch Rubber Company.

brown tire repair. The district court denied the motion, holding that the consent judgment did not contemplate that North Shore would have the sole right to use of the color brown for tire repairs and that North Shore, therefore, failed to meet its burden of providing clear and convincing evidence that Lucas was in violation of the 1979 injunction by his manufacture and sale of brown tire repairs. North Shore appeals from this final judgment.

### Standard of Review

■ In reviewing the district court's interpretation of the language and terms of the March 1979 consent judgment, we initially note that we are not bound by the clearly erroneous standard of review of Federal Rule of Civil Procedure 52(a). As the Supreme Court has stated, "consent decrees and orders have many of the attributes of ordinary contracts, [therefore] they should be construed basically as contracts." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). We have held that "our review of [a] district court's interpretation of [a] consent decree's language is comparable to review of a district court's contract interpretation and is not restricted by the clearly erroneous rule of F.R.Civ.P. 52(a); the matter may rather be considered afresh by this Court as a matter of law." *Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87, 90 (5th Cir.1978). *See also, Paragon Resources v. National Fuel Gas Distribution Corp.,* 695 F.2d 991, 995 (5th Cir.1983); *Kimbell Foods, Inc. v. Republic National Bank,* 557 F.2d 491, 495 (5th Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2230, 56 L.Ed.2d 400 (1978).

### Ambiguity in Consent Judgment

■ Simply stated, North Shore contends that the consent judgment prohibits Lucas from manufacturing and marketing a brown string-type tire repair. Lucas, however, contends the judgment merely prohibits him from manufacturing and marketing a string-type tire repair that could reasonably be confused with North Shore's Safety Seal product. The parties' opposing con-

structions stem from the language in the first paragraph of the judgment as printed, *supra.* That paragraph permits Lucas to sell individually wrapped tire repairs of the same size and shape as North Shore's, "*provided that* such product or products are not brown, brownish, orange-brown or any other color that could reasonably be confused with [North Shore's product] *and provided that* such product or products are not wrapped in blue, light-blue, greenish blue or other colored material reasonably likely to be confused with the wrapping on [North Shore's product]." (Emphasis added).

North Shore argues that the quoted language prohibits Lucas from manufacturing and selling tire repairs which are *either* brown in color or wrapped in blue paper. In support of its position, North Shore points to the fact that two "provided that" clauses were used to introduce the two restrictions and thus interprets this as two independent restrictions, the violation of either of which will subject Lucas to contempt charges.

Lucas, on the other hand, contends that the sole purpose of the consent judgment was to prevent him from palming off his product as North Shore's by using the same color, wrapping, and packaging. Lucas emphasizes the fact that the conjunction "and" was used between the restrictions and argues that the two provisions must be read as prohibiting him from manufacturing a product which is both brown and wrapped in blue paper. As further support for his position, Lucas points out that the judgment prevents him from marketing a product which could be confused with the product attached as Exhibit B to the judgment. Exhibit B was an actual sample of North Shore's product, a four-inch brown repair individually wrapped in blue parchment. In Lucas' view, a product that is either brown but not wrapped in blue paper or black but wrapped in blue paper is not violative of the consent judgment because such a product could not be reasonably confused with North Shore's product.

The district court in interpreting the judgment determined that the principal

limitation of the judgment appears in the first paragraph where it is stated that Lucas is enjoined from manufacturing "any product that could reasonably be confused with" North Shore's Safety Seal product. The court concluded that since Lucas' product is clearly distinguishable from North Shore's product, Lucas had not violated the consent judgment.

█ We hold that the consent judgment is ambiguous as a matter of law. *Paragon Resources, supra,* 695 F.2d at 995 (determination of contract ambiguity is a question of law). *See also City of Austin, Texas v. Decker Coal Co.,* 701 F.2d 420, 425–26 (1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir.1981). It is generally held that a document is ambiguous when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of construction. *Watkins v. Petro-Search, Inc.,* 689 F.2d 537, 538 (5th Cir. 1982); *Lee v. Flintkote Co.,* 593 F.2d 1275, 1282 (D.C.Cir.1979). As the court below noted, both parties offer reasonable interpretations of the language of the consent judgment in light of the surrounding circumstances. We conclude that the judgment falls within the generally accepted definition of an ambiguous document.

█ As the principles of contract interpretation dictate, we therefore look to extrinsic evidence to interpret its terms. *Eaton v. Courtaulds, supra,* 578 F.2d at 91. In doing so, we note that although the determination of a contract's ambiguity is a question of law, the determination of the party's intent through extrinsic evidence is a question of fact. *Paragon Resources, supra,* 695 F.2d at 995; *In re Stratford, supra,* 635 F.2d at 368. Consequently, we accept the district court's factual findings of the parties' intent unless such findings are clearly erroneous. *Ibid.*

### The Judgment's Intention

█ The district court made no express finding of ambiguity. It nonetheless made such an implied finding by looking to the parties' intent to determine the judgment's impact. It based its authority to do so on our decision in *Kaspar Wire Works, Inc. v. Leco Engineering and Machinery,* 575 F.2d 530 (5th Cir.1978). There we noted the distinction between a consent judgment and a judicial decision reached after trial, and held that a court should determine the impact of consent judgments "by the issues actually intended to be precluded by the parties." *Id.* at 539. In making the determination of which issues the parties intended to address by the consent judgment, the court relied upon the pleadings contained in North Shore's 1979 complaint, the circumstances which precipitated the filing of that complaint, and its knowledge of the negotiations which preceded the consent judgment.

Based upon these factors, the court found that the central issue sought to be litigated by North Shore in 1979 was Lucas' palming off of his Wonder Seal product as North Shore's Safety Seal. The court pointed out that the restriction on the color of the tire repair was only one aspect of North Shore's efforts to prevent Lucas from palming off his product as Safety Seal. At the time of the original action, Lucas was manufacturing a product which was similar to North Shore's product in appearance, marketing slogans, and packaging, all of which allegedly led to the confusion and deception of the public as to the true nature and origin of the two products. The court concluded that North Shore's goal in bringing its action in 1979 was to prevent Lucas from engaging in this type of unfair competition.

This conclusion is supported by details alleged in the complaint filed by North Shore in the original action. North Shore alleged that Lucas was engaging in a number of deceptive marketing practices. One such practice complained of was Lucas' use of a sales technique in which his salesmen would approach current users of North Shore's Safety Seal repairs (usually service station operators) and inquire as to whether they needed a fresh supply. Upon receiving an affirmative answer, they would simply

place a number of Lucas' repairs in loose form in the North Shore boxes already on the customers' shelves. Because Lucas' product was at that time brown and singularly wrapped in blue parchment, the customers did not realize they were purchasing Lucas' product rather than North Shore's. North Shore complained that this practice was not only deceptive, but that it had the additional effect of destroying North Shore's goodwill because the product unwittingly received by its customers was inferior to North Shore's Safety Seal.

North Shore also complained that Lucas was marketing his product in boxes which were the exact same size and shape as North Shore's boxes and contained the same slogan in the same location as on North Shore's boxes.

Although North Shore did in fact complain of Lucas' use of brown for his tire repairs, North Shore predicated this specific complaint on the allegations that unlike its tire repair manufacturing process, Lucas' process did not cause his product to be generically brown and that Lucas was therefore dyeing his product brown merely to confuse the public. As is pointed out below, brown is now a generic attribute of Lucas' new tire repair formula.

Appellant North Shore contends that even if the judgment is ambiguous, the best extrinsic evidence available to interpret its terms consists of the documents which preceded the making of the consent judgment. One such document is the settlement agreement, which provided in part:

"(3) Defendants are free to sell a string type repair of the same size and shape as Exhibit 9 [North Shore's Safety Seal] except that its color may not be brown ... or any color that can be reasonably confused therewith.

(4) Defendants are free to wrap the seal individually in parchment or release sheets except that the color thereof may not be blue ... or any color that can reasonably be confused therewith."

The two independent provisions of the settlement agreement can be taken to support North Shore's claim that the color of the repair and the color of the wrapping paper are independent limitations. The inclusion of these provisions in the settlement agreement, however, does not necessarily mean that they were included in the consent judgment. On the contrary, the settlement document on its face differs substantially from the agreed judgment.

A consent judgment represents a compromise between the parties. As the Supreme Court stated in *United States v. Armour & Co.*:

Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation... Because the defendant has, by the decree, waived his right to litigate the issues raised ... the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

Upon finding that North Shore's essential complaint in 1979 was Lucas' palming off his product as North Shore's, the district court properly concluded that the intent of the consent judgment was to prevent precisely this conduct—the palming off—and not to prevent completely Lucas' use of the color brown. We agree with the district court's finding as to the intent of the judgment.[5]

5. In accepting the district court's findings, we note that although the best indication of the intended effect of an agreement is the actual language of the agreement, when this language is ambiguous the trial court is in a better position to make factual findings as to the agree-

### Is the Judgment Violated?

Our next inquiry is to determine whether Lucas' present manufacture of a brown tire repair violates the intent of the consent judgment, that is, whether his product is so reasonably confusing to the public as to constitute a palming off as North Shore's Safety Seal. We conclude that it is not.

Where the issue is confusion of the purchasing public, we have held that the court should consider the entire package rather than any single component of it. *Association of Co-operative Members, Inc. v. Farmland Industries, Inc.,* 684 F.2d 1134, 1140 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1428, 75 L.Ed.2d 788 (1983). The rationale behind this position lies in the common sense conclusion that in order to determine whether the product confuses the purchasing public, the court must necessarily view the product as it appears to the consumer at the time of sale. Lucas' product admittedly may not be distinguished from North Shore's upon complete unwrapping. But the Supreme Court has suggested that it is confusion at the time of sale that is relevant, not confusion at some point thereafter. *See Sears Roebuck & Co. v. Stiffel,* 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964).

It is undisputed that the product now manufactured by Lucas is easily distinguishable from North Shore's product in packaging, labelling, and marketing slogans. Moreover, there is no indication or complaint that Lucas has continued to utilize the deceptive sales techniques allegedly used in 1979. North Shore, in fact, concedes that the only provision of the consent judgment that may have been violated is Lucas' use of the color brown in the tire repair itself. It is clear that the facts support the district court's conclusion that Lucas' use of the color brown alone does not render his product reasonably confusing to the public. It is equally clear that Lucas is engaging in no other conduct to mislead and confuse the public. We therefore conclude, as did the district court, that Lucas is not in contempt of the consent judgment by his mere production and sale of a brown tire repair.

As we noted in *Baddock v. Villard,* 606 F.2d 592, 593 (5th Cir.1979), "[t]he judicial contempt power is a potent weapon which should not be used if the court's order upon which the contempt was founded is vague or ambiguous." To support a contempt finding, "the court's order must set forth in specific detail an unequivocal command." *Ibid., quoting H.K. Porter Co., Inc. v. National Friction Products Corp.,* 568 F.2d 24, 27 (7th Cir.1977). We cannot say that the consent judgment unequivocally commands Lucas to give up all rights to manufacture brown tire repairs.

### Unfair Competition Implications

We may properly rest our affirmance of the district court's decision on a finding that the judgment is ambiguous and a subsequent conclusion that the trial court's findings of intent are not clearly erroneous. We nonetheless address an alternative issue raised by the parties. We inquire whether upholding a judgment prohibiting appellee from manufacturing a brown tire patch no matter what the circumstances would interfere with the federal policy, found in Art. I, § 8, cl. 8 of the Constitution and its implementing federal statutes, of permitting competitors to copy freely unpatented articles. *See* 35 U.S.C. §§ 1–293. It is well established that the issue is one of federal law. *Sears Roebuck & Co. v. Stiffel, supra,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661; *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

We address first a major argument presented by appellant. North Shore concedes that it did not establish or raise the

---

ment's intended effect than we, as an appellate court are. This is particularly true in this case since here the agreement was a judgment sanctioned and signed by the court at the parties' instigation. Moreover, the court presided over the proceedings which led to the making of the judgment and thus was in an excellent position to determine that the issue of North Shore's exclusive right to manufacture brown tire repairs was not raised in these proceedings.

issue of an exclusive right to manufacture and market brown tire repairs in the 1979 dispute. It argues, however, that the proper inquiry should not be whether it established an exclusive right to the use of the color brown, but rather, whether it properly established a right to be protected against Lucas' past abusive and fraudulent use of the color. North Shore contends that it did establish the latter right and that the remedy sought and received by virtue of the consent judgment was Lucas' forfeiture of his right to manufacture brown tire repairs.

■ The practical effect of this Court's acceptance of North Shore's argument would be that North Shore would be granted a monopoly as against Lucas in the production of brown tire repairs. As we have noted, the public has a vested interest "in permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Kaspar,* 575 F.2d at 541, *quoting Lear, Inc. v. Adkins,* 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610 (1969). In *Kaspar,* this Court refused to interpret a consent decree in such a way as to give a patent validity when the facts failed to indicate that the parties expressly intended to resolve the issue of patent validity by the terms of the consent decree.

Similarly, in the instant case, North Shore is in effect asking this Court to prevent a competitor from marketing brown tire repairs without there ever having been an adjudication of the right to use the color brown, and without any express affirmation of North Shore's exclusive right to use brown in the consent judgment. As in *Kaspar,* we hold that public interest in the free dissemination of ideas and principles of competition demands no less than a clear showing that *both* parties intended to resolve the question of the right to use of the color brown by the terms of the consent judgment. As the district court's factual findings of intent indicate, no such showing has been made in this instance.

An established "fair competition" inquiry which concerns us is the *Sears-Compco* doctrine set out by the Supreme Court in *Sears Roebuck & Co. v. Stiffel Co., supra,* 376 U.S.

225, 84 S.Ct. 784, 11 L.Ed.2d 661 and *Compco Corp. v. Day-Brite Lighting, Inc., supra,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669. This principle permits the copying of a product as long as purchasers are not misled as to the true source of the product. The Supreme Court noted in the *Sears* case, that an unpatented article is "in the public domain and may be made and sold by whoever chooses to do so." 376 U.S. at 231, 84 S.Ct. at 789.

At issue in *Sears,* was Sears' right to copy a lamp manufactured by the Stiffel Co. The Court held:

> What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel. This it had every right to do under the federal patent laws. That Stiffel originated the pole lamp and made it popular is immaterial. "Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested."

*Sears,* 376 U.S. at 231, 84 S.Ct. at 789, *quoting Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 122, 59 S.Ct. 109, 115, 83 L.Ed. 73 (1938).

It is undisputed that North Shore does not have a patent on the red lead process which produces a brown tire repair. Appellant, in fact, concedes that other tire repair manufacturers produce brown tire repairs. Its sole aim is to prohibit Lucas from manufacturing the brown repairs. The Supreme Court's mandate in the *Sears* and *Compco* decisions controls. We do not interpret the consent judgment to deprive Lucas of a right "possessed by all" other manufacturers in the tire repair business.

Appellant also argues that its brown tire repair has acquired a secondary meaning in the market place in that customers have learned to identify North Shore's Safety Seal product simply by its brown color, and that this was one of the determinative factors behind the judgment's proscription of Lucas' use of the color brown. But again we remind that North Shore concedes other manufacturers make brown repairs. Fur-

ther, the Supreme Court has stated that the fact that a product's configuration has a secondary meaning does not "furnish a basis for . . . prohibiting the actual acts of copying and selling." *Compco*, 376 U.S. at 238; 84 S.Ct. at 782. This conclusion indicates that "secondary meaning" would have been an invalid basis upon which to proscribe Lucas' use of brown, even if we accept North Shore's contention that it raised this issue in 1979. The district court's interpretation of the consent judgment correctly avoids violation of this principle.

The *Sears-Compco* doctrine also permits the copying of an unpatented article even if the design is "unfunctional", *i.e.*, not essential to the manufacture or use of the product. It follows that one may produce brown tire repairs even though a repair of the same type and quality can be produced in a color other than brown. The record indicates, however, that the color of the Lucas tire repair is in fact functional or generic and not merely a matter of design. The repairs are brown due to a red lead component which gives the repairs their essential self-vulcanizing quality.

Acceptance of appellant's position in this case would mean that Lucas would be required to incur the additional expense of dyeing his product another color, even though every other tire repair manufacturer is freely permitted to manufacture brown tire repairs. More important, the courts have uniformly rejected sanctioning exclusive rights to product color. *William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. 526, 531, 44 S.Ct. 615, 617, 68 L.Ed. 1161 (1924); *Association of Co-operative Members, Inc. v. Farmland Industries, Inc.,* supra, 684 F.2d at 1140; *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 161 (1st Cir.1977); *Norwich Pharmacal Co. v. Sterling Drug, Inc.,* 271 F.2d 569, 572 (2d Cir.1959); *National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc.,* 532 F.Supp. 651, 656 (W.D.Wash.1982); *Artus Corp. v. Nordic Co., Inc.,* 512 F.Supp. 1184, 1188–9 (W.D.Pa.1981); *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.,* 481 F.Supp. 1184, 1187 (D.N.J.1979); *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cine-ma, Ltd.,* 467 F.Supp. 366, 374 (S.D.N.Y.) *aff'd,* 604 F.2d 200 (2d Cir.1979). North Shore occupies the same position as a cola manufacturer attempting to prohibit other cola manufacturers from selling brown cola. This Court could not properly sanction such a color restriction. Palming off is the proper issue, not color.

Even though "mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying," we recognize that the right to copy unpatented articles is not absolute. *Sears,* 376 U.S. at 232, 84 S.Ct. at 789. The Supreme Court suggests that when there is confusion as to who manufactured nearly identical goods, a court may appropriately require that "goods, whether patented or unpatented, be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source." *Ibid.* There is ample evidence that the two products at issue here are clearly distinguishable. In fact, North Shore concedes as much.

We conclude that the right to which North Shore is entitled is that of being protected against unfair competition, not "of having the aid of a decree to create or support, or assist in creating or supporting, a monopoly of the sale of a preparation, which every one [other than Lucas] is free to make and vend." *William R. Warner & Co., supra,* 265 U.S. at 532, 44 S.Ct. at 618. The legal wrong cannot exist in the mere use of the color brown. There must be "unfair and fraudulent advantage which is taken of such use." *Ibid.* It is clear that Lucas is not engaging in any deceptive marketing practices and has in fact taken every reasonable step to insure that his product is not confused with others. Consequently, this Court is upholding public policy and the principles of fair competition by concluding that Lucas did not violate the terms of the consent judgment by manufacturing brown tire repairs.

We make this ruling in accordance with the full scope of review required by *United States v. Loew's, Inc.,* 371 U.S. 38, 52, 83

S.Ct. 97, 9 L.Ed.2d 11 (1962) and *United States v. United States Gypsum Co.,* 340 U.S. 76, 89, 71 S.Ct. 160, 169, 95 L.Ed. 89 (1950). In these two cases, the Supreme Court acknowledged the superior ability of the trial judge to formulate an adequate decree, but held that it was the appellate court's duty "to examine the decree in light of the record to see that the relief it affords is adequate to prevent the occurrence of the illegality which brought on the given litigation." *Loew's,* 371 U.S. at 52, 83 S.Ct. at 105. In *Gypsum* and *Loew's,* the Supreme Court remanded the cases to the district court for modification of the decrees in question on the grounds that they did not adequately protect against unfair competition. The instant situation differs in that rather than modifying the decree, we uphold the trial court's application of its terms. In doing so, we stand ready to insure that the injunctive decree adequately protects against unfair competition. But we must be certain that the decree does not sweep too broadly by denying the alleged wrongdoer the rights to which he is justifiably entitled as a competitor in our free market system.

In sum, we conclude that the consent judgment is ambiguous on its face. We affirm the district court's findings that the intent behind the consent judgment was to prevent Lucas' palming-off activities, not to preclude his use of the color brown. The district court correctly concluded that Lucas' production and sale of a brown tire repair in a nonconfusing, nondeceptive manner is not in contempt of the consent judgment. Further, we recognize that a contrary holding would result in the deprivation of Lucas' right to manufacture brown tire repairs—a right possessed by every other tire repair manufacturer. We conclude that such a result would be contrary to public policy and the principles of fair competition.

AFFIRMED.