12 F.3d 480
 25 Bankr.Ct.Dec. 292, Bankr. L. Rep. P 75,711
 In the Matter of Harris R. FENDER, Jr., David M. Fender and
Zapata Partnership, Ltd., Debtors.
TRANSAMERICAN NATURAL GAS CORPORATION, Appellant-Cross Appellee,
v.
ZAPATA PARTNERSHIP, LTD., Appellee-Cross Appellant.
 No. 92-4967.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 27, 1994.
Rehearing Denied March 15, 1994.*
 
 John Nabors, Cynthia Hollingsworth, Richard E. Miller, Gardere & Wynne, Dallas, TX, Keith Dollahite, Hardy & Atherton, Michael A. Hatchell, Ramey & Flock, P.C., Tyler, TX, Stacy R. Obenhaus, Gardere & Wynne, Dallas, TX, for appellant.
 David W. Elrod, Thomas C. Jones, Calhoun, Gump, Spillman & Stacy, P.C., Dallas, TX, for appellee.
 Appeals from the United States District Court for the Eastern District of Texas.
 Before REYNALDO G. GARZA, KING and DeMOSS, Circuit Judges.
 REYNALDO G. GARZA, Circuit Judge:
 
 
 1
 TransAmerican Natural Gas Corporation appeals the bankruptcy and district courts' interpretation of a settlement agreement between it and Zapata Partnership, LTD. We AFFIRM the bankruptcy court in all respects, except we REVERSE the bankruptcy court's conclusion that TransAmerican owed Zapata a duty of good faith and fair dealing, and the amount of attorneys' fees it awarded Zapata. If the bankruptcy court based any of Zapata's damages on breach of the duty of good faith and fair dealing, then we REMAND to reduce Zapata's damage award accordingly. Finally, we REMAND to the bankruptcy court to make the appropriate reduction in Zapata's attorneys' fees.
 
 I. BACKGROUND
 
 2
 Appellant TransAmerican Natural Gas Corporation ("TransAmerican") is a Texas corporation. Appellee Zapata Partnership Ltd. ("Zapata") is a Texas limited partnership. This case is in federal court because it arose from a bankruptcy adversary proceeding. Both TransAmerican and Zapata had mineral interests in 2,000 acres of real property known as the La Perla B tract ("the tract"), which is part of the La Perla Ranch in Zapata County, Texas.
 
 
 3
 Zapata owned a 27.77 percent mineral interest in the tract.[1] TransAmerican was an operator who had obtained a leasehold interest in the tract, but had not been able to lease Zapata's 27.77 percent interest. TransAmerican and Zapata were thus cotenants in the tract's minerals. TransAmerican drilled five wells on the tract and completed three of them as gas wells. Zapata did not consent to the drilling of these wells nor did it advance any costs. The wells began producing in 1986. As an unleased cotenant, Zapata was entitled to a "profit share" of the production from the wells.
 
 
 4
 On March 20, 1987, several creditors of Zapata filed an involuntary Chapter 11 proceeding against Zapata. At the time the involuntary petition was filed, TransAmerican owed Zapata substantial sums of money in connection with the gas wells TransAmerican had drilled. Zapata filed an adversary proceeding against TransAmerican in August 1987, claiming that TransAmerican used improper accounting and charged Zapata in excess of its reasonable costs, forcing Zapata into bankruptcy.
 
 
 5
 Both parties agreed to settle the lawsuit, entering into a settlement agreement on December 17, 1988 which was incorporated into a final judgment in the bankruptcy court on December 19, 1988.[2] Paragraph 7 of the settlement agreement concerned the amount TransAmerican would pay Zapata as a result of TransAmerican's litigation with El Paso Natural Gas Company ("ENGC").
 
 
 6
 TransAmerican had a gas purchase agreement with ENGC which included the La Perla B gas wells. Under the agreement, ENGC was to pay TransAmerican a certain price for a set minimum amount of gas, whether ENGC actually took delivery of the gas or not. This agreement is known in the industry as a "take-or-pay" provision.[3] While TransAmerican was still litigating the first adversary proceeding against Zapata, it brought an action against ENGC claiming that ENGC had stopped taking delivery of gas and had refused to make take-or-pay payments. Therefore, when TransAmerican and Zapata were negotiating their 1988 settlement, one of the assets on the negotiation table was TransAmerican's potential recovery against ENGC.
 
 
 7
 About a year after the settlement agreement between Zapata and TransAmerican, the dispute between TransAmerican and ENGC was itself settled. Under that settlement, ENGC agreed to pay TransAmerican $300,000,000 in cash along with some non-cash assets ("the El Paso recovery"). The cash damages included "price" damages, "take-or-pay" damages and "repudiation" damages.
 
 
 8
 Zapata and TransAmerican disagreed on the interpretation of paragraph 7 of their settlement agreement. After TransAmerican refused to pay sums Zapata contended were due, Zapata filed another adversary proceeding (the suit now on appeal) on March 16, 1990, alleging, inter alia, that TransAmerican had breached the settlement agreement.
 
 
 9
 The bankruptcy court agreed with Zapata's interpretation of paragraph 7 and found that TransAmerican had breached the settlement agreement. The bankruptcy court found that Zapata was entitled to $11,590,811 under paragraph 7. The bankruptcy court concluded, however, that because TransAmerican settled with ENGC and only received 63 percent of the damages awarded to it in cash, Zapata was only entitled to receive 63 percent of the $11,590,811. Therefore, the bankruptcy court awarded Zapata $7,3000,210.93 as damages relating to paragraph 7.
 
 
 10
 TransAmerican appealed to the district court and the district court entered a judgment on July 28, 1992, affirming the bankruptcy court's interpretation of paragraph 7. The district court, however, modified the bankruptcy court's judgment with regard to Zapata's litigation expenses, and ordered that the attorneys' fees be paid directly to Zapata rather than its attorneys.
 
 
 11
 After its post-judgment motions were denied, TransAmerican filed its notice of appeal to this Court on September 16, 1992. Zapata cross-appeals challenging the bankruptcy court's reduction of its damages.II. ANALYSIS
 
 
 12
 TransAmerican raises five issues on appeal. TransAmerican claims the bankruptcy court erred in: (1) its interpretation of paragraph 7 of the settlement agreement; (2) its rulings on parol evidence; (3) concluding that TransAmerican breached a duty of good faith and fair dealing; (4) awarding Zapata $43,200 as reimbursement for money Zapata paid to maintain its leases; and (5) the amount of attorneys' fees it awarded to Zapata.
 
 
 13
 Zapata cross-appeals claiming that the bankruptcy court erred in reducing its damage award from $11,590,811 to $7,302,210.93.
 
 
 14
 We find that the bankruptcy court did not err in: (1) its interpretation of the settlement agreement; (2) its rulings on parol evidence; (3) awarding Zapata $43,200 as reimbursement; and (4) reducing Zapata's damage award from $11,590,811 to $7,302,210.93. The bankruptcy court, however, erred in: (1) concluding that TransAmerican breached a duty of good faith and fair dealing; and (2) the amount of attorneys' fees it awarded to Zapata.
 
 A. Interpretation of paragraph 7
 
 15
 TransAmerican claims the bankruptcy court erred in its interpretation of paragraph 7 of the December 17, 1988 settlement agreement.
 
 
 16
 Paragraph 7 of the settlement agreement reads as follows:
 
 
 17
 Plaintiff [Zapata] will retain and be entitled to receive its pro rata portion of any money received by Defendant [TransAmerican] as a result of its litigation with El Paso Natural Gas Company with respect to any differential in price applicable to the sale of gas from wells drilled on the Ranch. Plaintiff's share of any such proceeds will be for gas sold through October 31, 1988. Any adjustment in the price obtained from gas or make-up gas taken after that date will be paid on the basis of Plaintiff's 17.5% overriding royalty interest.
 
 
 18
 TransAmerican argues that its settlement agreement with Zapata concerned only an accounting and payment for gas produced and sold from the La Perla B wells; therefore Zapata should receive its pro rata share of only that part of the El Paso recovery which relates to gas that was actually removed from the ground and delivered to a purchaser. TransAmerican's interpretation would greatly reduce Zapata's share, because the great majority of the El Paso recovery was calculated not from gas produced and sold, but from projections of gas that would have been sold had ENGC not repudiated the gas purchase agreement. The damages were to compensate harm to TransAmerican's expectation interest--its right to expect gas purchases to be made in the future under its contract with ENGC. Thus, TransAmerican argues that any money that it received in settlement of its claims against ENGC cannot be considered "money received ... with respect to any differential in price applicable to the sale of gas from wells drilled on the ranch." TransAmerican argues that Zapata, as the owner of an overriding royalty interest, will receive its share of revenues when the natural gas is actually produced and sold. TransAmerican claims that Zapata's rights as a royalty owner would not be infringed by this interpretation of paragraph 7.
 
 
 19
 TransAmerican concludes, therefore, that Zapata should only receive a pro rata share of the "price" damages in the El Paso recovery--the portion of the settlement proceeds applicable to ENGC's refusal to pay the full contract price for gas it purchased. This interpretation of paragraph 7 would give Zapata $806 from the El Paso recovery, rather than the $7,302,210 awarded to Zapata by the bankruptcy and district courts.
 
 
 20
 Zapata in contrast, argues that this is a contract case, rather than an oil and gas case. Zapata claims that in the December 1988 negotiations--in addition to insisting upon the $1.7 million for unpaid gas production--it bargained for a larger share of the El Paso recovery in exchange for settling additional "business loss" claims it had against TransAmerican, i.e., bankruptcy expenses, accounting, breach of fiduciary duty and punitive damages.[4] Zapata claims that it is illogical that it would have settled its substantial claims for $806. Zapata asserts that instead, it bargained for and received in paragraph 7 a substantial share of the El Paso judgment. Zapata argues that it would not have settled if TransAmerican had taken the position in 1988 that Zapata was only entitled to "price" damages.
 
 
 21
 Zapata further argues that the language of paragraph 7, "differential in price," describes the entire El Paso recovery, and that TransAmerican's witnesses admitted this on cross-examination. Moreover, Zapata argues that all of the proceeds it claimed, constituted price differentials regarding a gas contract applicable to the La Perla B Ranch. Finally, Zapata argues that the phrase "with respect to any differential in price applicable to the sale of gas from wells drilled on the Ranch" merely identifies the litigation; it does not limit the types of damages in which Zapata would share.
 
 
 22
 It is undisputed that Texas law governs the construction of the settlement agreement. "Under Texas law, the contract must be analyzed in light of all of the surrounding circumstances." Hanssen v. Qantas Airways Ltd., 904 F.2d 267, 270 (5th Cir.1990). Furthermore, this court "must abide by tenets of contract construction and seek to ascertain the true intentions of the parties by examining 'the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.' " Chapman v. Orange Rice Mill Co., 747 F.2d 981, 983 (5th Cir.1984) (citing, Coker v. Coker, 650 S.W.2d 391, 393 (Tex.1983)) (emphasis in original). It is generally held that a document is ambiguous when it is reasonably susceptible to more than one meaning, in light of surrounding circumstances and established rules of constructions. North Shore Lab. Corp. v. Cohen, 721 F.2d 514, 519 (5th Cir.1983).
 
 
 23
 Finding the settlement agreement susceptible to more than one meaning, we hold that it is ambiguous as a matter of law. "As the principles of contract interpretation dictate, we therefore, look to extrinsic evidence to interpret its terms." Id. Although the determination of a contract's ambiguity is a question of law, the determination of the parties' intent through extrinsic evidence is a question of fact. Id. Hence, we accept the bankruptcy court's factual findings of the parties' intent, unless such findings are clearly erroneous. Id.
 
 
 24
 The bankruptcy court did not make an express finding of ambiguity. Nonetheless, it made an implied finding of ambiguity by looking to the parties' intent to determine the settlement agreement's effect. Id. The bankruptcy court expressly found that K. Craig Shepard was not credible with respect to his testimony regarding the settlement agreement.[5] Shepard testified that under paragraph 7 of the settlement agreement, Zapata was entitled only to a pro rata portion of the "price" damages. The bankruptcy court also expressly found that "M. Lindsay Sneed was the most credible witness with respect to his testimony regarding the December 17, 1988 Settlement Agreement."[6] Sneed testified that the language of paragraph 7 was phrased broadly to prevent any subsequent attempts by TransAmerican to recharacterize the damages. Sneed also testified that at no time did TransAmerican's representatives suggest that paragraph 7 was limited to "price" damages of approximately $806. Sneed further testified that Zapata would not have settled if TransAmerican had taken the position that Zapata was only entitled to a share of "price" damages.
 
 
 25
 Furthermore, the bankruptcy court expressly found that "[p]ursuant to the credible weight of the evidence, paragraph 7 of the December 17, 1988 Settlement Agreement is not restricted to what TransAmerican referred to as 'price' damages from the El Paso litigation." Finally, the bankruptcy court found that paragraph 7 of the Settlement Agreement entitled Zapata to recover a pro rata portion of the damages classified as (a) "price" damages, (b) "take or pay" damages and (c) "repudiation" damages from the El Paso litigation.
 
 
 26
 In affirming the bankruptcy court's interpretation of paragraph 7, the district court affirmed all of the bankruptcy court's findings of fact and conclusions of law with regard to that paragraph.
 
 
 27
 We hold that the bankruptcy court's finding that the parties intended to convey to Zapata a pro rata portion of the "price", "take or pay" and "repudiation" damages is not clearly erroneous. Generally, royalty interest owners do not share in "take or pay" payments and settlements. Hurd Enters., Inc. v. Bruni, 828 S.W.2d 101, 106-07 & n. 8 (Tex.App.--San Antonio, 1992, writ denied). We have been unable to find any case that holds this as to mineral interest owners and not royalty interest owners. Since we hold that the payments owed to Zapata were under the contract, we need not decide whether mineral interest owners are entitled to "take or pay" payments or settlements. That issue is left for a future case to resolve. The bankruptcy court found that Zapata was entitled to the "take or pay" damages because the parties intended to convey these damages to Zapata in paragraph 7 of the settlement agreement. Thus, it is paragraph 7, as evidenced by the parties intent and not Zapata's status as a mineral interest owner, that is dispositive.
 
 
 28
 Moreover, part of the reason Zapata assigned its 27.77 percent mineral and royalty interest in exchange for a 17.5 percent overriding royalty interest was that Zapata would also receive a pro rata portion of the damages from the El Paso litigation.
 
 
 29
 We, therefore, affirm the bankruptcy and district court's interpretation of paragraph 7.
 
 B. Parol Evidence
 
 30
 TransAmerican claims that the bankruptcy court improperly considered parol evidence offered by Zapata in construing paragraph 7, but excluded parol evidence TransAmerican offered in rebuttal.
 
 
 31
 As stated earlier in this opinion, the bankruptcy court's decision to allow parol evidence was an implied finding of ambiguity. Therefore, it is unnecessary to address this issue.
 
 C. Duty of good faith and fair dealing
 
 32
 TransAmerican claims that the bankruptcy court erred in finding that it owed Zapata a duty of good faith and fair dealing, and that TransAmerican breached this duty when it settled with ENGC without Zapata's knowledge or consent.
 
 
 33
 Zapata claims there was an imbalance in bargaining power and a relationship of trust because of Zapata's lack of knowledge about the El Paso lawsuit. However, as TransAmerican points out, the El Paso lawsuit was public record, and Zapata did not try to verify, through an examination of court records, the information about the settlement it had gleaned from the newspapers. Furthermore, the authority Zapata cites, Gardner Mach. Corp. v. U.C. Leasing, Inc., 561 S.W.2d 897, 900 (Tex.Civ.App.--Beaumont 1978, writ dism'd), does not support Zapata's claim that a duty of good faith and fair dealing exists in this case.
 
 
 34
 The bankruptcy court's conclusions are contrary to Texas law. Under Texas law, there is no duty of good faith and fair dealing in contracts generally,[7] and in cotenancy law, there is no fiduciary or agency relationship (which might create such a duty) between cotenants unless they create it by agreement.[8] The 1988 settlement agreement between Zapata and TransAmerican did not create such a duty, hence TransAmerican was not required to obtain Zapata's approval or consent before it settled with ENGC.
 
 
 35
 Therefore, the bankruptcy court's conclusions of law on this issue--that TransAmerican had a duty of good faith and fair dealing and breached such a duty--were erroneous. It is unclear from the bankruptcy court's findings and conclusions of law whether it based any damages upon a breach of good faith and fair dealing. If the bankruptcy court based any of Zapata's damages upon this erroneous conclusion, then that portion of the judgment is reversed and the bankruptcy court should reduce Zapata's damages accordingly.
 
 D. Reimbursement for lease payments
 
 36
 TransAmerican claims that the bankruptcy court erred in requiring it to reimburse Zapata for lease payments that Zapata made to maintain its leases.
 
 
 37
 The 1988 settlement agreement required Zapata to assign its mineral interest (and its 2.77 percent leasehold interest) to TransAmerican. Zapata tendered an offer of assignment, and TransAmerican refused to accept it, claiming it attempted to expand Zapata's rights beyond what had been agreed. Meanwhile, payments came due on leases Zapata was attempting to assign. Although the date on which TransAmerican was to assume responsibility for the leases had passed, Zapata made payments of $43,200 to keep the leases from terminating.
 
 
 38
 TransAmerican claims that the lease payments remained Zapata's responsibility because Zapata's tender of assignment was unacceptable. However, the bankruptcy court ordered TransAmerican to reimburse Zapata for these payments, based on its conclusion that Zapata had tendered an acceptable assignment which TransAmerican refused to accept. The district court expressly affirmed this conclusion, and TransAmerican has not demonstrated that this conclusion was erroneous.
 
 
 39
 Therefore, the bankruptcy court's order requiring TransAmerican to reimburse Zapata for the lease payments is affirmed.
 
 E. Attorneys' Fees
 
 40
 TransAmerican claims that the enhancement, which raised the attorneys' fees awarded to 1.7 times the lodestar amount, is not justified under the Texas and federal courts' standards for awarding fees. The bankruptcy court awarded Zapata $299,444.83 in attorneys' fees, which included a "lodestar" figure of $170,603 plus a "fee enhancement" of an additional $119,422.[9]
 
 
 41
 The Fifth Circuit uses the "lodestar" method to calculate attorneys' fees. Shipes v. Trinity Industries, 987 F.2d 311, 319-20 (5th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 548, 126 L.Ed.2d 450 (1993). The lodestar is computed by multiplying the number of hours reasonably expended by the prevailing hourly rate in the community for similar work. Id. The court then adjusts the lodestar upward or downward depending upon the respective weights of the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974).[10] The lodestar may be adjusted according to a Johnson factor only if that factor is not already taken into account by the lodestar. Shipes, 987 F.2d at 319-20.
 
 
 42
 The bankruptcy court's determination of attorneys' fees is reviewed for abuse of discretion, and its specific findings of fact supporting the award are reviewed for clear error. Id. at 319. Although the awarding court must explain how each of the Johnson factors affects its award, the amount awarded lies in the judge's discretion and is recalculated only if the judge abuses that discretion. Longden v. Sunderman, 979 F.2d 1095, 1100 (5th Cir.1992).
 
 
 43
 In this case, the bankruptcy court, after a separate evidentiary hearing, made findings of fact noting the great amount of time required for the prosecution of the case, the intricate and complex issues involved, the high level of skill needed, the size of the judgment achieved, the relatively low percentage relation of fees to judgment achieved, and the experience of some of Zapata's counsel. These findings take into account Johnson factors 1, 2, 3, 8 and 9. The district court concluded that these factors justified the bankruptcy court's upward adjustment of the lodestar by a factor of 1.7. The bankruptcy court, however, appears to have improperly double-counted several of the Johnson factors. As the Shipes case explains:
 
 
 44
 The district court [awarding attorneys' fees] must be careful, however, not to double count a Johnson factor already considered in calculating the lodestar when it determines the necessary adjustments ... Four of the Johnson factors--the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained from the litigation--are presumably fully reflected in the lodestar amount. Although upward adjustments of the lodestar figure based on these factors are still permissible, such modifications are proper only in certain rare and exceptional cases supported by both specific evidence on the record and detailed findings by the lower courts.
 
 
 45
 Shipes, 987 F.2d at 320.
 
 
 46
 Nothing in the bankruptcy court's findings show this case to be "rare and exceptional." Since Johnson factors 2, 3, 9, and 8 were already accounted for in the lodestar amount, the bankruptcy court abused its discretion in using those factors to justify its substantial upward departure from the lodestar.
 
 
 47
 Therefore, we remand to the bankruptcy court to calculate the proper amount of attorneys' fees.
 
 F. Reduction of Damages
 
 48
 Zapata argues on cross appeal that the bankruptcy court erred in reducing its damage award.
 
 
 49
 The original judgment in the El Paso lawsuit was $480 million but only 63 percent of that, $300 million, was in cash. Hence, when the bankruptcy court calculated Zapata's pro rata share, it followed the language of paragraph 7--"pro rata portion of any money received"--and used the cash amount rather than the total amount. Based on this decision, the bankruptcy court reduced Zapata's share of the El Paso recovery from $11,590,811 to $7,302,210.93.
 
 
 50
 Zapata argues that since TransAmerican was allowed to negotiate whether ENGC would pay it cash or non-cash assets, it had an unfair control over Zapata's share. Zapata argues that regardless of whether it was contractually entitled to recover its pro rata share of the non-cash assets, it should be allowed to recover such proceeds as damages for breach of the duty of good faith and fair dealing. In the alternative, Zapata cites Webster's dictionary to argue that the term "money" includes property and other valuable interests, not just cash.[11]
 
 
 51
 As TransAmerican points out, there is no evidence that it intentionally withheld information from Zapata or intended to compromise Zapata's interest in the settlement proceeds. TransAmerican also repeats correctly that there was no duty of good faith and fair dealing in this case.
 
 
 52
 Therefore, the bankruptcy court's interpretation of the term "money" and its calculation of Zapata's share of the El Paso recovery are affirmed.
 
 III. CONCLUSION
 
 53
 We AFFIRM the bankruptcy court in all respects, except we REVERSE the bankruptcy court's conclusion that TransAmerican owed Zapata a duty of good faith and fair dealing, and the amount of attorneys' fees it awarded Zapata. If the bankruptcy court based any of Zapata's damages on breach of the duty of good faith and fair dealing, then we REMAND to reduce Zapata's damage award accordingly. Finally, we REMAND to the bankruptcy court to make the appropriate reduction in Zapata's attorneys' fees.
 
 
 54
 DeMOSS, Circuit Judge, concurring in part and dissenting in part:
 
 
 55
 I concur in all of the foregoing opinion with the exception of Part II(A) and (B) as to which I respectfully dissent. In my view, the fundamental errors made by the bankruptcy judge were in never expressly deciding whether the language of the letter agreement of December 17, 1988, was ambiguous and in opening the floodgates to parol testimony as to what the various parties had in their minds when they wrote that letter agreement. The majority opinion recognizes that the bankruptcy judge never made an express finding of ambiguity, but lets the matter slide by considering that the bankruptcy judge "impliedly" made such a finding. I would not let the bankruptcy judge off so easy.
 
 
 56
 The last paragraph of the letter agreement contains the following sentence:
 
 
 57
 "Despite the expectation of impending documentation, this agreement shall be enforceable immediately in law or in equity, without further agreements between the parties and specific performance may be compelled."
 
 
 58
 When parties include language to such effect in their written agreements, I think they are attesting to the principle of law behind the Parol Evidence Rule, i.e., this agreement reflects the totality of our agreements and is not to be varied by oral testimony as to what we were really talking about. Furthermore, in my view, the provisions of the letter agreement of December 17, 1988, and in particular Paragraphs 1 and 7 thereof, are not ambiguous. When read just as they exist on paper, the provisions can be applied to determine the rights of the parties "without further agreements," just as the quoted sentence of the letter agreement contemplated. The determination of whether a contract is ambiguous is a matter of law which this court can address de novo. I would reverse and remand for application of the settlement agreement language without consideration of the parol testimony.
 
 
 
 *
 DeMoss, Circuit Judge, would grant the petition for rehearing
 
 
 [1]
 Zapata also owned 100 percent of the surface interest and a 2.77 percent leasehold in the tract
 
 
 [2]
 The settlement agreement provided, among other things, for TransAmerican to pay Zapata a $1,700,000 judgment, and for Zapata to assign to TransAmerican all of its mineral interest in the tract, reserving a 17.5 percent overriding royalty interest
 
 
 [3]
 Dorney v. Henderson Clay Products, Inc., 838 S.W.2d 314, 315 & n. 3 (Tex.App.--Texarkana 1992, writ denied)
 
 
 [4]
 In response to this point, TransAmerican argues that the "additional claims" were settled for $400,000 in Paragraph 1 of the settlement letter. The $400,000 is included in the $1.7 million judgment. Zapata replies that TransAmerican is misreading Paragraph 1, and insists that it would not have settled the whole lawsuit for $1.7 million
 
 
 [5]
 Shepard negotiated and executed the settlement agreement on behalf of TransAmerican
 
 
 [6]
 Sneed is Zapata's Chief Financial Officer and participated in the settlement agreement negotiations
 
 
 [7]
 English v. Fischer, 660 S.W.2d 521, 522 (Tex.1983); Manufacturers Hanover Trust Co. v. Kingston Investors Corp., 819 S.W.2d 607, 610-11 (Tex.App.--Houston [1st Dist.] 1991, no writ)
 
 
 [8]
 Donnan v. Atlantic Richfield, 732 S.W.2d 715, 717 (Tex.App.--Corpus Christi 1987, writ denied)
 
 
 [9]
 The district court reversed the bankruptcy court's additional award of $9,419.83 in litigation expenses, and the parties do not contest this point on appeal
 
 
 [10]
 The twelve Johnson factors are: (1) time and labor required, (2) novelty and difficulty of the issues, (3) skill required to perform the legal services properly, (4) preclusion of other employment, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by client or circumstances, (8) amount involved and results obtained, (9) experience, reputation and ability of the attorneys, (10) undesirability of the case, (11) nature and length of the professional relationship with the client, and (12) award in similar cases
 
 
 [11]
 TransAmerican cites the Random House dictionary to argue that "money" means anything generally used as a medium of exchange the same way cash is used; in normal usage, it does not mean stock, real property or intangible rights