**MASTERCRAFT FABRICS CORPORATION,**
**Plaintiff,**

v.

**DICKSON ELBERTON MILLS INC., Defendant.**

**Civ. A. No. 91–68 ATH (DF).**

United States District Court,
M.D. Georgia,
Athens Division.

May 25, 1993.

---

6.  This is the version of the statute in effect at the time these conveyances were made.

Cubbedge Snow, Jr., Macon, GA, Steven B. Pokotilow, Laura E. Goldbard, and Michele P. Schwartz, New York City, for plaintiff.

Bruce W. Baber, Atlanta, GA and John B. Hardaway, Greenville, SC, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

FITZPATRICK, District Judge.

This action originated in 1991, when Plaintiff Mastercraft Fabrics Corporation ("Mastercraft") sued Defendant Dickson Elberton Mills, Inc. ("Dickson") for allegedly violating Plaintiff's copyright rights in a plaid fabric with a moire background, called DUNHAM, by producing a plaid fabric with a moire background, called CHATEAU. As a result of the settlement of that litigation, the parties entered into a Final Judgment On Consent ("Consent Judgment"), the alleged violation of which forms the basis of Plaintiff's present motion to hold Dickson in civil contempt. The Court, having considered the parties' affidavits and memoranda of law, and having heard the live testimony and arguments of counsel at an evidentiary hearing held on January 7, 1993, finds the facts to be and states its conclusion of law as follows:

## I. FINDINGS OF FACT

### A. Parties and Cause of Action

1. Plaintiff Mastercraft is a manufacturer of woven upholstery furniture fabric. (Byrnes, Tr. at 79).[1]

2. Dickson Elberton is a manufacturer of fabrics for the outdoor furniture and indoor upholstery market. (Petot, Tr. at 105).

3. On December 22, 1992, Plaintiff Mastercraft filed a Motion for Civil Contempt against Defendant Dickson Elberton based on Defendant's alleged violation of a Consent Judgment signed by this Court on July 22, 1991. An evidentiary hearing was held in connection with the Motion on January 7, 1993.

### B. The 1991 Action

4. Mastercraft introduced an upholstery fabric known as DUNHAM into the marketplace in the spring of 1988. (Byrnes Aff. ¶ 4; PX–1). The DUNHAM fabric was an immediate success and has been Mastercraft's most successful fabric design over the past four years. (Byrnes, Tr. 43–44; PX–14, 15). Of the 700 to 800 new fabric designs Mastercraft introduces each year, the DUNHAM fabric continues to be one of the best selling fabrics in the entire Mastercraft line. (Byrnes, Tr. 44–47, 77; Byrnes Aff. ¶ 4). In addition, DUNHAM is one of the most successful and recognizable upholstery fabrics in the entire United States and in European woven and textile markets. (Byrnes, Tr. at 44–47; Byrnes Aff. ¶ 4).

5. The copyright in the DUNHAM design is owned by Mastercraft and is registered under Registration No. VA 440–894. (1991 Complaint and Exhs. 2–3 annexed thereto).

6. On April 25, 1991, Mastercraft filed an action before this Court against Dickson for copyright infringement of the DUNHAM fabric design based on Dickson Elberton's manufacture and sale of a fabric design known as CHATEAU, which Mastercraft alleged was copied from DUNHAM. (Byrnes Aff. ¶ 5; PX–2; 1991 Complaint). The action was settled pursuant to a Settlement Agreement dated May 1, 1991. (Byrnes Aff. ¶ 5; PX–4). The Consent Judgment, which is an attachment and part of the Settlement Agreement (Byrne Affidavit, Ex. 4 at ¶ 10), was signed by the Court on July 22, 1991. (PX–5).

7. In the Consent Judgment, Defendant Dickson Elberton admitted that Dickson CHATEAU fabric design is substantially similar to Mastercraft's DUNHAM design and is an infringement of the design and the copyright registration therefor. (PX–5, ¶ 3).

1. References to pages of the transcript from the Hearing shall be designated "TR"; references to the affidavits submitted by the parties shall be designated by the surname of the affiant followed by "Aff." and the relevant paragraph number; references to Plaintiff's or Defendant's exhibits submitted during the Hearing shall be designated as "PX" or "DX", respectively; references to the pleadings in the 1991 Action shall be referred to by their appropriate titles.

The Consent Judgment further states at paragraph 4:

> Defendant Dickson, its officers, agents, servants, employees, successors, assignors and all person in active concert or participation with them, will receive actual notice of this Order by personal service or otherwise are permanently restrained and enjoined from selling, offering for sale, producing, weaving, advertising and promoting Defendant's design CHATEAU or any design which appears substantially similar thereto.

(PX–5, ¶ 4).

## C. Creation Of The CHATEAU And INFERNO Fabric Designs

8. Defendant Dickson Elberton's designer, Sarah Moore, and other Dickson designers created the CHATEAU fabric design. (Moore, Tr. at 174). Ms. Moore also created the INFERNO fabric design in May or June of 1991, during a meeting with representatives of Clayton Marcus, a customer of Defendant. (Moore, Tr. at 166–167, PX–9).

9. Clayton Marcus had been interested in a CHATEAU [2] and was looking for a stripe and plaid coordinate. Dickson intended to create a pattern that would avoid any further claim of infringement by Mastercraft. Ms. Moore and the Clayton Marcus representatives discussed several different jacquard motifs that could be put in a plaid to distinguish it. They decided that a flame stitch was a good option. Ms. Moore sketched the flame stitch. She then used an old Dickson pattern called CARY for the vertical (or fill) striping pattern. (Moore, Tr. at 168–174; DX–12; DX–13). The warp that appears in INFERNO was created in January 1991, by Susanna Flannigan, another Dickson employee.[3] (Moore, Tr. 172–73).

2. At the time Ms. Moore created INFERNO, she was aware of the litigation concerning the CHATEAU fabric.

3. All Dickson plaid fabrics run on the same exact warp as CHATEAU PLAID and INFERNO, including PAVILLON, CLAYTON, CARY, DAVIDSON and HAMPTON. (Moore, Tr. at 172–73).

4. In his August 8, 1991 letter Mr. Hardaway stated that:

10. In July of 1991, attorneys for Mastercraft received a sample of INFERNO from Clayton Marcus (Luedtke, Tr. at 212–213) for review. (Id.) Thomas Byrnes, the Vice President of Marketing at Mastercraft (Byrnes, Tr. at 42), reviewed what he recalls to be the INFERNO fabric sample at the offices of Mastercraft's attorneys and opined that INFERNO was another infringement of DUNHAM and CHATEAU. (Byrnes, Tr. at 73).

11. Shortly after the creation of the INFERNO design in 1991, and after the parties' settlement had been signed in June of 1991, plaintiff learned of the INFERNO fabric and plaintiff's counsel corresponded with Dickson's counsel about it. (Hardaway Decl. ¶ 4).

12. Mastercraft's earliest correspondence concerning "the flamed stitch pattern" is dated July 31, 1991, and Dickson's counsel, Mr. Hardaway, states in his declaration that he did not discuss the INFERNO pattern with Plaintiff's counsel until after the agreement had been consummated. (Hardaway Decl. ¶ 4).

13. The parties reached no agreement in 1991 concerning whether Dickson could sell the INFERNO pattern without protest by plaintiff, and the correspondence ended with Dickson's counsel advising plaintiff's counsel, in early August of 1991,[4] that Dickson had no plans at that time to offer the INFERNO fabric for sale. (Hardaway Decl. ¶ 9).

14. In early 1992, Dickson's change of ownership was completed and the top management of the company was replaced. (Petot, Tr. at 114). Shortly after the then-President of Dickson, Mr. Ron Druckman, settled the 1991 litigation with Mastercraft, and before INFERNO was sold, Mr. Druck-

> "the pattern resulted from a combination of features of previous patterns of Dickson Elberton Mills. We did not reach any agreement regarding the fabric. I simply represented that Dickson Elberton Mills has no plans to produce, sell, promote or otherwise deal in the particular fabric pattern. You and your client can rely on that representation. If there is a decision to the contrary, we will advise you." (PX–8).

man was terminated for cause. (Petot, Tr. at 108).

15. Dickson's management at the time INFERNO was introduced in 1992 was new to the company and was unaware of the letter that Dickson's prior counsel had written to plaintiff's counsel in August of 1991 regarding Dickson's plans not to sell the INFERNO fabric at that time. (Petot, Tr. at 114).

16. Dickson completed the design of one colorway of INFERNO in mid–1991. The fabric was still in development, however, throughout late 1991 and 1992. Pattern samples were introduced at the July 1992, market and the pattern was introduced at the October 1992, market. (Moore, Tr. at 184, 186). Prior to its introduction in October 1992, Clayton Marcus was given the right to sell INFERNO in exclusive colorway 6200DK, which is a jewel tone fabric. (Moore, Tr. at 190–191; DX–9).

17. Mr. Luedtke, the Director of Merchandising for Dickson Elberton, authorized the introduction of INFERNO into the marketplace. Neither Mr. Luedtke nor Mr. Petot, President of Dickson Elberton Mills,[5] knew of the existence of the Settlement Agreement or Mr. Hardaway's August 8, 1991, letter at the time the INFERNO was introduced. (Petot, Tr. at 113–114; Luedtke, Tr. at 204, 214–215; PX–11).

18. Based on the foregoing findings of fact, the Court concludes that Dickson did not have notice of Mastercraft's objection to the INFERNO fabric a year prior to the contempt motion. Furthermore, the Court finds that Dickson did not intentionally disregard Mastercraft's copyright rights nor did it have a legal obligation to provide Mastercraft with notice of its plan to produce the INFERNO fabric. Consequently, the Court concludes that Dickson did not act in bad faith.

### D. The Facts Underlying the Civil Contempt Motion

19. Plaintiff Mastercraft became aware of Defendant Dickson Elberton's manufacture

and sale of INFERNO fabric on or about November 16, 1992, from a photograph on the cover of a fall catalog for Haverty's Furniture Company, Inc., which depicts two sofas upholstered with the INFERNO fabric. (Byrnes, Tr. at 69–70; Byrnes Aff. ¶ 7; PX–6). Attorneys for Mastercraft reviewed the catalog on November 17, 1992. (Goldbard Aff. ¶ 2).

20. On November 19, 1992, Mastercraft's counsel notified Mr. Hardaway, the attorney that defended Dickson Elberton and negotiated the Settlement Agreement in the 1991 Action, of the violation of the Consent Judgment and the alleged infringement of Mastercraft's DUNHAM fabric. (Byrne, Tr. at 69–70; PX–7). Mastercraft's counsel requested and received a small swatch of INFERNO fabric from Dickson Elberton on December 9, 1992. (Byrnes Aff. ¶ 9; PX–9).

21. Plaintiff subsequently filed its Motion for Contempt on December 22, 1992.

### E. The Fabric Designs

22. Plaintiff Mastercraft accuses Dickson of contempt as a result of Dickson's sale of a plaid furniture fabric having an angular, zigzag background or "ground pattern" that is known in the fabric industry as a "flame stitch." (Walden, Tr. at 139).

23. The CHATEAU and INFERNO plaids are composed of three principal components: (1) horizontal or "warp" stripes (which run in the vertical dimension of the fabric during manufacture); (2) vertical or "fill" stripes (which run horizontally during manufacture); and (3) a background or "ground pattern," which appears in the interstices between the horizontal and vertical stripes. (Walden, Tr. at 132–33).

24. The standard repeat of a warp pattern in the furniture upholstery industry is 27 inches or an even division thereof, e.g., 13½ inches. (Moore, Tr. at 172–74; Walden, Tr. at 144). Thus, although the repeat of the warp is the same in both fabrics at issue, the size and shape of a plaid within the repeat of a design can be varied. Dickson made a business decision to have a limited number of

---

5. Mr. Petot became President of Dickson on January 5, 1992. He saw the Final Judgment on Consent and settlement agreement for the first time in November 1992. (TR 113).

warps as the foundations of its designs. (Moore, Tr. at 172–173).

25. The "jewel tones," i.e., deep reds, blues and greens have been the most popular, best-selling colors in the upholstery industry over the last several years. (Byrnes, Tr. at 99; Walden, Tr. at 134–35). Indeed, many of the colors used by various furniture upholstery manufacturers come from the same supplier. (Walden, Tr. at 124).

26. A flame stitch pattern, which is present in the ground pattern of INFERNO, and the moire, which is present in the ground pattern of CHATEAU, are well-recognized as distinct weaving effects in the fabric industry. (Walden, Tr. at 139). A moire is a sophisticated, watered-silk mark pattern, whereas the flame stitch is a more casual pattern. (Walden, Tr. at 132, 138; Luedtke, Tr. at 205).

27. The most apparent and striking difference between the INFERNO fabric and the CHATEAU fabrics is that the background pattern in the INFERNO fabric is a flame stitch (Petot, Tr. 116–17; Walden, Tr. at 140–42; Moore, Tr. at 167–69; Luedtke, Tr. at 205), whereas the CHATEAU has moire-type background patterns (Byrnes Tr. 89; Walden, Tr. 132, 136; Luedtke, Tr. 205).

28. Plaintiff's sole witness, Mr. Byrnes, agreed: he acknowledged that flame stitch and moire patterns are "very, very different, classic patterns, each in their own right" (Byrnes, Tr. 87) and could easily recognize both from across the courtroom. (Byrnes, Tr. 87).

29. The size of open panels or square holes that are framed by the intersecting stripes in CHATEAU and INFERNO are similar. Despite the similarities in the fabrics, the flame stitch in INFERNO drastically alters the aesthetic impression produced by INFERNO and makes it distinctly different from CHATEAU. The flame stitch, unlike the moire, is not subtle nor is it wavy. The wavy moire design in CHATEAU gives a calmer, smoother, more subdued and flowing aesthetic impression than INFERNO. The flame stitch in INFERNO is jagged with sharp zig-zags conveying a bold and striking yet casual aesthetic impression. Thus, although both fabrics are similar plaids with ground designs inside the open panels or holes between the stripes, the textual aesthetic impressions are distinct.

30. Additionally, the distinctive, top-stitched "ribbon stripes" present in the CHATEAU are not present in INFERNO, and INFERNO has a vertical striping pattern that is not identical in any respect to the CHATEAU pattern and contains textured striping features not present in it. (Byrnes, Tr. 81–83; Walden, Tr. 140–41).

31. Virtually all of the aspects in which INFERNO may be said to be "similar" to CHATEAU PLAID are the result of: (1) all three fabrics being plaids and therefore consisting of repeated or "mirrored" horizontal stripes, repeated or "mirrored" vertical stripes, and interstices between them (Byrnes, Tr. 91–92; Walden, Tr. 143–44, 160–61); and (2) the use by the parties of the most popular color combinations desired by customers. (Byrnes, Tr. 98–99; Walden, Tr. 135).

32. The INFERNO design has a vertical (fill) striping pattern that is different in numerous respects from the CHATEAU PLAID vertical striping pattern. The fill stripes in the INFERNO pattern are of different sizes from those in the CHATEAU PLAID pattern; they are textured, unlike the stripes in the CHATEAU PLAID pattern; and they lack altogether the allegedly distinctive top-stitched stripe borders that were present in the vertical stripes of the CHATEAU design. (Walden, Tr. at 140–41).

33. These differences result in an overall fabric design which, while still admittedly a plaid and still of the same general type as all plaid furniture fabric designs, is clearly distinguishable from the overall CHATEAU design. Of the three basic design elements of all plaids—the ground pattern, the horizontal stripes and the vertical stripes—the INFERNO pattern differs significantly from the prior Dickson CHATEAU fabric with respect to two of the three.

34. The Court also heard testimony from and was able to judge the credibility of both Ms. Moore, who created the INFERNO fabric, and Mr. Luedtke, who participated in the

discussions preceding its creation. As Ms. Moore's testimony and Dickson's exhibits 12 and 13 demonstrated, the INFERNO pattern was not in any respect copied from, based on or a variation of CHATEAU. (Tr. 168–74; DX–12; DX–13). Ms. Moore explained the process she followed in creating INFERNO, including her freehand drawing of the flame stitch pattern (Moore, Tr. 169, DX–12) and her use of Dickson's prior CARY pattern for the striping effects. (Moore, Tr. 168). Both she and Mr. Luedtke testified, without contradiction, that Dickson's goal in creating its INFERNO pattern was to ensure that it was a new pattern, different from CHATEAU, as to which there could be no further difficulties with Plaintiff. (Moore, Tr. 167–68, 177–78; Luedtke, Tr. 205–06, 212).

35. Both the furniture manufacturers that are the parties' customers and those manufacturers' furniture retailer customers buy both the flame-stitch INFERNO fabric and the moire-type DUNHAM fabric, and offer them side by side to customers. (Luedtke, Tr. 197–98).

36. If, as Plaintiff argues, the two in fact gave the same overall impression or "look," no furniture manufacturer would purchase two such redundant fabrics. Nor, if the two fabrics had "the same overall appearance" (Plaintiff's Memorandum of Law, filed December 22, 1992, ("1992 Mem.") at 13), would a retailer, with floor space in his showroom at a premium, display furniture with both a flame stitch plaid fabric such as INFERNO and a moire-type plaid fabric such as DUN-HAM. (Luedtke, Tr. at 197–99).

37. Finally, the evidentiary record dispels any notion and disproves any possible claim by plaintiff that Dickson has acted in bad faith. Both Mr. Petot and Mr. Luedtke explained to the Court the recent history of Dickson (Petot, Tr. 107–15; Luedtke, Tr. 202–05); the termination of Dickson's prior president, who had negotiated the 1991 settlement with plaintiff (Petot, Tr. 108, 113; Luedtke, Tr. 203–04); and their unawareness of even the existence of the Final Judgment until they received plaintiff's correspondence regarding INFERNO in November 1992. (Petot, Tr. 113–14; Luedtke, Tr. 204, 214, 215). All of the Dickson witnesses testified that they were aware that plaintiff's suit against Dickson based on CHATEAU had been resolved by Dickson agreeing not to sell that fabric, and they acted consistent with that understanding. None of them knew, however, that any part of that settlement could in any way affect Dickson's ability to sell the new INFERNO fabric. (Petot, Tr. 114; Luedtke, Tr. 203). The facts in evidence reflect Dickson's good faith and its full compliance with what its officers understood to be its obligations—not to sell CHATEAU PLAID or any other moire plaid like CHATEAU. (Petot, Tr. 114; Moore, Tr. 167).

38. To the extent that any of the foregoing findings of fact are deemed to be conclusions of law, then this Court construes such findings as conclusions of law.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction And Interpretation Of The Consent Judgment

39. This Court has jurisdiction over the parties and the subject matter of this action and venue in this District is proper as set forth in paragraph 1 of the Consent Judgment. (PX–5).

■ 40. Mastercraft has the burden of proving its charge of civil contempt by clear and convincing evidence; to sustain its charge, it must prove by clear and convincing evidence that Dickson has violated the 1991 Final Judgment. *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990).

■ 41. If Plaintiff successfully makes such a showing, the burden then shifts to Dickson to show substantial compliance, *Howard Johnson Co.*, 892 F.2d at 1516; compliance in fact; or that it should not be forced to comply strictly with the order because of changed circumstances. *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir.1990).

42. As the federal courts have long recognized,

A court may hold a party in civil contempt only if there is a clear and unambiguous order, noncompliance is proved clearly and convincingly, and 'the defendant has not been reasonably diligent and energetic

in attempting to accomplish what was ordered.' *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981) (citing cases).

*Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 889 F.2d 389, 394 (2d Cir.1989), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990). As the courts have also acknowledged, contempt is a "potent weapon" that should not be invoked if the underlying court order upon which the contempt charge is founded is vague or ambiguous; for this reason,

> Contempt is committed only if a person violates a court order requiring in specific and definite language that a person do or refrain from doing an act. *Baddock v. Villard (In re Baum)*, 606 F.2d 592, 593 (5th Cir.1979).

*Martin v. Trinity Industries, Inc.*, 959 F.2d 45, 47 (5th Cir.1992).

43. Similarly, Rule 65 of the Federal Rules of Civil Procedure requires that every injunction shall "be specific in terms" and "shall describe in reasonable detail ... the act or acts to be restrained." Fed.R.Civ.P. 65(d). Consistent with this requirement, the courts require that:

> To hold a party in contempt, the district court 'must be able to point to a decree from the court which "set[s] forth in specific detail an unequivocal command" which the party in contempt violated.' *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir.1986) (quoting *H.K. Porter Co. v. National Friction Prods.*, 568 F.2d 24, 27 (7th Cir.1977)).

*Stotler & Co. v. Able*, 870 F.2d 1158, 1163 (7th Cir.1989).

44. These principles make clear that the contempt remedy is one that should be used sparingly and only in circumstances where these stringent requisites have been met.

45. Plaintiff Mastercraft moves for a finding that Defendant Dickson Elberton is in civil contempt based on Defendant's alleged violation of paragraph 4 of the Consent Judg-

ment which states in pertinent part that Defendant is "permanently restrained and enjoined from selling, offering for sale, producing, weaving, advertising, and promoting Defendant's design CHATEAU or any design which appears substantially similar thereto." (PX–5).

46. Pursuant to paragraph 10 of the Settlement Agreement between the parties (Byrnes Aff., Exhibit 4), the Settlement Agreement and Consent Judgment constitute the entire Agreement between the parties. Accordingly, the Court finds that the Settlement Agreement and the Consent Judgment are to be governed and interpreted under the laws of the State of New York,[6] as set forth in paragraph 8 of the Settlement Agreement. (Byrnes Aff., Exhibit 4).

47. A consent judgment is a judicial act whereby a Court has adjudicated a plaintiff's right of recovery. *Pope v. United States*, 323 U.S. 1, 12, 65 S.Ct. 16, 22, 89 L.Ed. 3 (1944); *A.D. Juilliard & Co. v. Johnson*, 166 F.Supp. 577 (S.D.N.Y.1957), *aff'd*, 259 F.2d 837 (2d Cir.1958), *cert. denied*, 359 U.S. 942, 79 S.Ct. 723, 3 L.Ed.2d 676 (1959). Furthermore, "a consent judgment is a conclusive adjudication and has the same force and effect as a judgment after trial." *Prudential Lines, Inc. v. Firemen's Ins. Co. of Newark*, 91 A.D.2d 1, 3, 457 N.Y.S.2d 272, 274 (1st Dept.1982).

48. A consent judgment is to be interpreted as a contract between the parties and is constrained by traditional contract principles. *Securities and Exch. Comm'n v. Levine*, 881 F.2d 1165, 1179 (2d Cir.1989). A court construing a consent judgment is not entitled to expand or contract the agreement of the parties as set forth in the Consent Judgment. *Securities and Exch.*, 881 F.2d at 1179.

49. Under New York contract law, if a contract is unambiguous, extrinsic evidence is not admissible to affect its interpretation. *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir.

---

6. The Court's ultimate conclusion concerning the Consent Order would be the same even if the Court applied Georgia law.

1990). The language of a contract is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself and concerning which there is no reasonable basis for a difference of opinion." *Metropolitan Life*, 906 F.2d at 889. Conversely, under New York contract law, an ambiguous word or phrase is defined as:

> one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in a particular trade or business.

*Pantone, Inc. v. Esselte Letraset, Ltd.*, 878 F.2d 601, 606 (2d Cir.1989) (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)).

■ 50. The Court finds that the language in paragraph 4 of the Consent Judgment is unambiguous and must be interpreted pursuant to the plain meaning of the paragraph. Accordingly, no extrinsic evidence is admissible to affect this interpretation. *Metropolitan Life*, 906 F.2d at 894.

■ 51. In view of the underlying copyright infringement action, which precipitated the Consent Judgment, the fact that the attorneys responsible for negotiating and drafting the Settlement Agreement and Consent Judgment specialize in copyright law, as well as the use of the same term in paragraph 3 of the Consent Judgment, the Court finds that the phrase "substantially similar" in paragraph 4 of the Consent Judgment is to be interpreted in accordance with its usual meaning under the Copyright Laws of the United States.

52. In interpreting paragraph 4 of the Consent Judgment, the Court finds no language that requires the Court to make an additional finding that Defendant's INFERNO design infringes or is substantially similar to Plaintiff's DUNHAM design, in order to find Defendant in contempt.

■ 53. Defendant's contention that Plaintiff's interpretation of paragraph 4 of the Consent Judgment is anticompetitive and contrary to the "copyright misuse doctrine" cannot be given great weight given the facts and law herein. In the first instance, the Court finds that Defendant Dickson knowingly negotiated and agreed to comply with the restriction placed on it under the terms of the Consent Judgment.

54. Furthermore, Defendant's citation to *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970 (4th Cir.1990), is inapposite because, in the instant case, the parties *intended*, pursuant to the terms of the Consent Judgment, to prohibit Dickson Elberton from manufacturing and selling fabric that is substantially similar to the CHATEAU fabric design. As long as both parties intended to resolve the 1991 Action in this manner, the Consent Judgment must be enforced accordingly even if the Consent Judgment does not promote competition. *North Shore Laboratories Corp. v. C. Cohen*, 721 F.2d 514 (5th Cir. 1983), does not require a different conclusion.

55. In *North Shore* the Fifth Circuit, which had concluded that the consent decree at issue was ambiguous, rejected the plaintiff's interpretation of the ambiguous language because it would have given the plaintiff a monopoly against the defendant in the production of a tire repair in the color of brown. 721 F.2d at 522. The appellate court held that "the public interest in the free dissemination of ideas and principles of competition demands ... a clear showing that *both* parties intended to resolve the question of the right to use of the color brown by the terms of the consent judgment." *Id.* (Emphasis in original). In the instant case, however, the Consent Judgment is unambiguous. Consequently, *North Shore* does not support Defendant's argument for misuse of copyright.[7]

---

7. Plaintiff contends that the Eleventh Circuit has declined to apply this defense. Admittedly, this circuit refused to apply the copyright misuses doctrine to the facts in *Bellsouth Advertising & Publishing Corp. v. Donnelly Info. Publishing, Inc.*, 933 F.2d 952, 961 (11th Cir.1991), *vacated,* 977 F.2d 1435 (11th Cir.1992). Nevertheless, it did not explicitly reject the doctrine as a viable defense in any situation. Rather, the Eleventh Circuit acknowledged that "the patent misuse defense closely fits the copyright law situation and may someday be extended to discipline those

56. Commercial litigants who have negotiated a voluntary consent judgment accepted by a court in termination of a litigation, which is costly to both defendant and plaintiff, should not be amended in view of the greater public policy and " 'overriding interest in the finality and repose of judgments' on consent." *W.L. Gore & Assoc. v. C.R. Bard, Inc.*, 977 F.2d 558, 563 (Fed.Cir.1992) (citing *Mayberry v. Maroney*, 558 F.2d 1159, 1164 (3d Cir.1977)). When faced with a conflict of policies and taking into account the overriding interest in the finality of a judgment on consent, as well as the unambiguous language in the Consent Judgment, the Court must reject Defendant's claim that the consent judgment is anticompetitive.

### B. CHATEAU And INFERNO Are Not Substantially Similar

57. The standard for measuring "substantial similarity", as stated in paragraph 4 of the Consent Judgment, and as prescribed under Copyright Law, is the "ordinary observer test", which has been adopted by this circuit. *See Original Appalachian Art Works, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 829 (11th Cir.1982) (*citing Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir.1980)).

58. Substantial similarity is determined by the scrutiny the ordinary observer [8] is likely to give an accused and an original design as the designs are normally used. *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960). The ordinary observer test has been stated as "whether the average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," *Malden Mill, Inc. v. Regency Mills, Inc.*, 626 F.2d 1112, 1114 (2d Cir.1980) (*quoting Ideal Toy Corp. v. Fab-Lu, Ltd.*, 360 F.2d 1021, 1022 (2d Cir.1966)); *see Original Appala-*

*chian*, 684 F.2d at 829–30, and whether "the ordinary observer, unless he set out to detect the disparities would be disposed to overlook them and regard their aesthetic appeal as the same." *In Design v. Lynch Knitting Mills, Inc.*, 689 F.Supp. 176, 179 (S.D.N.Y.), *aff'd without opinion*, 863 F.2d 45 (2d Cir.1988) (*quoting Peter Pan Fabrics*, 274 F.2d at 487, 489 (2d Cir.1960)).

59. The Court declines to apply the Second Circuit's "more discerning ordinary observer" test. That test, which was enunciated in *Folio*, is to be applied when a design contains both protectible and unprotectible elements and dictates that the Court ignore the unprotected aspects of designs when comparing them. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 141 (2d Cir.1992). In *Folio*, however, the Second Circuit applied the more discerning ordinary observer test because the entire background design of the fabric came from a public domain source. Defendant, without citing any authority, contends that the plaid aspect of the design is an unprotected element of the design. Thus, under Defendant's view a designer should never be able to obtain a copyright on a plain plaid pattern. Unfortunately, the Second Circuit does not agree. It rejected a similar argument concerning an argyle plaid in *Novelty Textile Mill, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1093 (2d Cir.1977) and held that the plaintiff had established a prima facie case that the defendant had infringed its argyle plaid design. Consequently, since plaid designs have received protection, the Court declines to apply the discerning ordinary person test to exclude the plaid aspect of the fabrics from its comparison of them.

60. The Court finds that when viewing the CHATEAU and INFERNO separately at various distances, side by side as well as on top of each other,[9] it is readily

---

who abuse their copyrights." *Id.* Similarly, although this Court thinks that copyright misuse may be a viable defense under the appropriate circumstances, such circumstances do not exist in this case.

**8.** The court makes its own determination concerning substantial similarity. *See Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 766 (2d Cir.1991) ("we review the district court's

finding de novo ... because what is required is only a visual comparison of the works rather than credibility, which we are in as good a position to decide as was the district court.")

**9.** Courts have compared fabrics by laying them on top of one another, *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F.Supp. 1347, 1353 (S.D.N.Y. 1987), and by viewing them from a distance of 20 feet. *Novelty Textile Mills v. Joan Fabrics Corp.*,

apparent to an ordinary observer that CHATEAU and INFERNO do not have the same general aesthetic appeal, *see Malden Mill,* 626 F.2d at 1114 (same general impression given by both fabrics); that an ordinary observer would not recognize INFERNO as having been copied from CHATEAU, *id.,* and would not overlook the disparities unless they were pointed out to him. *In Design,* 689 F.Supp. at 179.

61. The Court finds that although both fabrics are plaids in similar colors the main aspect of the design, which Plaintiff finds objectionable, is the flame stitch in the open panel. This conclusion is supported by Plaintiff's failure to accuse Dickson's PAVILLON fabric, which is identical to CHATEAU, except that it has a solid, plain background, of infringement or as a violation of the Consent Judgment. (Tr. at 67, 137, 199).

62. The Court rejects Plaintiff's contention that the flame stitch in INFERNO creates the same general impression as the moire in the CHATEAU fabric. While Plaintiff may protect its particular expression of the idea of a plaid with a textured background, it cannot prevent another manufacturer from expressing that same idea in a different fashion, *see* 17 U.S.C. § 102(b); *Mazer v. Stein,* 347 U.S. 211, 207 (1954); *In re Capital Cities/ABC, Inc.,* 918 F.2d 140, 144 (11th Cir.1990), which is precisely what Dickson did when it developed INFERNO.

63. The similarity in the positioning and symmetry of the design cannot overcome the distinct impression created by the evident difference in the open panels or holes between the stripes. The flame stitch aspect of INFERNO, a difference that is virtually impossible to overlook, is distinctly different from the moire in CHATEAU and creates an entirely different impression.[10] The ordinary observer is struck by the differences in the fabrics rather than the similarities. *See Hedaya Bros. v. Capital Plastic, Inc.,* 493 F.Supp. 1021 (S.D.N.Y.1980) (differences in designs gave the designs different aesthetic appeals, which the ordinary observer would recognize).

64. Consequently, the Court finds that Plaintiff has not submitted clear and convincing proof that the INFERNO fabric design is substantially similar to CHATEAU. Accordingly, the Court finds that Defendant is not in contempt of the Consent Judgment.

65. Moreover, even if the fabrics were substantially similar, the Court further finds that Defendant did not intend to create a fabric design that is substantially similar to the CHATEAU design and that the evidence of independent creation would rebut a prima facie case of copying. *See* ¶ 8, 9, 12, *supra.*

66. Finally, the Court declines to award attorneys' fees under 17 U.S.C. § 505 to the Defendant.

## CONCLUSION

Accordingly, for the reasons stated above, Plaintiff's motion for contempt is DENIED.

SO ORDERED.

558 F.2d 1090, 1093 (2d Cir.1977). The Court expresses no opinion as to the proper distance at which the fabrics are to be viewed or whether they must be laid on top of one another nor does the Court believe that the Second Circuit's statements as to distance enunciate the only method of comparison. The important point is that no matter how this Court viewed the fabrics it reached the conclusion that they are not substantially similar.

10. Plaintiff contends that Defendant cannot avoid a finding of substantial similarity by "merely" changing one element of the design, i.e., a moire to a flame stitch. Plaintiff further states that noting such a difference is a "daisy counting approach", which has been explicitly rejected by the Second Circuit. *See Malden Mill,* 626 F.2d at 1114. The Court concedes that noting each difference in detail is inappropriate. Nevertheless, unlike the differences in the details of the infringing fabric in *Malden Mill,* which simulated the same effect as the plaintiff's design, the flame stitch in INFERNO does not simulate the impression created by the moire in CHATEAU.