United States Court of Appeals,

Fifth Circuit.

No. 92-4173.

In the Matter of TROY DODSON CONSTRUCTION COMPANY, INC., Debtor (Two Cases).

UNITED PACIFIC INSURANCE CO. and Reliance Insurance Co., Appellants,

v.

George McCLELLAND and Mehaffy, Weber, Keith & Gonsoulin, Appellees.

MBANK BEAUMONT, a/k/a Bonnet Resources, Inc., Etc., Appellant,

v.

George McCLELLAND and Mehaffy, Weber, Keith & Gonsoulin, Appellees.

June 29, 1993.

Appeal from the United States District Court for the Eastern District of Texas.

Before JONES and BARKSDALE, Circuit Judges, and PRADO,[*] District Judge.

PER CURIAM:

It is remarkable that in a case with so much money at stake, the lien creditors, trustee and administrative priority creditors created a record full of ambiguities and unclarity at all stages. Nevertheless, this court must play the hand it was dealt and has conscientiously tried to sort out the parties' claims in light of what was rational and ethical at the time of their assertion.

This is a dispute over the proceeds of a settlement of claims made by the former Chapter 11 debtor Troy Dodson Construction Co., Inc. and the City of Beaumont. The lawsuit, filed in state court before Dodson entered bankruptcy, sought to recover monies owed on the Phelan Boulevard Construction Project and damages for alleged torts including libel and slander, breach of good faith and fair dealing, negligent performance, and misfeasance. After Dodson's case had been converted to a Chapter 7 liquidation, the trustee negotiated a $750,000 settlement with the City, which the bankruptcy court approved.

All of the parties to this litigation took part in the state court suit in some form or fashion, a

_____

[*]District Judge of the Western District of Texas, sitting by designation.

fact the bankruptcy court later found dispositive against the appellants. During the course of litigation, Dodson's sureties United Pacific Insurance Company and Reliance Insurance (collectively "UPIC") had been impleaded by the City on its claims against their bonds, and MBank had attempted to intervene as the lienholder on Dodson's accounts receivable. The sureties' presence as third-party defendants became moot when the case settled, and their attorney approved the final judgment as to form and substance. Dodson opposed MBank's motion to intervene, asserting *inter alia* that the bank had no standing; the state court struck the motion to intervene without opinion. MBank did not appeal.

Dodson's trustee obtained bankruptcy court approval to enter into the settlement and receive $350,000 cash from the City and $400,000 as a receiver's claim against a failed insurer of the City. At least $150,000 of the settlement proceeds were paid by the City from a municipal bond fund for street construction projects.

After MBank filed a motion in bankruptcy court asserting its claim as a secured accounts receivable creditor on the settlement proceeds, the sureties pled their competing claims, and the appellees (debtor's original Chapter 11 attorney and accountant) undertook to defend the trustee's settlement as a source of unsecured revenue for the debtor. Appellees' intervention was not philanthropic: at the time of settlement, they both had administrative priority claims dating from the failed reorganization, and this lawsuit provided their only hope for a fund of unencumbered assets from which to seek reimbursement.

The bankruptcy court heard testimony on November 17, 1988 concerning the parties' claims, and in April 1990, he entered findings of fact and conclusions of law holding against the lien creditors. There were alternative bases for this ruling. On one hand, the bankruptcy court held that the sureties and MBank failed, by inaction in the state court proceeding, to preserve their respective claims to the proceeds from the settlement. On the other hand, the bankruptcy court held that the judgment and settlement agreement concerning the state court suit were ambiguous, and the evidence before it did not show that the settlement was paid on account of Dodson's contract claims against the City. Rather, the settlement was found to be directed solely at the tort claims made against the

City—claims that the court held were not subject either to the sureties' bonding contracts or to MBank's accounts receivable lien. The district court affirmed for essentially the same reasons, 135 B.R. 504, spawning this appeal.

## DISCUSSION

The issues raised before us are numerous and may best be listed in the order in which we will address them:

(1) Does *res judicata* or collateral estoppel arise from the state court's order denying MBank's motion to intervene and preclude its assertion of a lien claim in bankruptcy court?

(2) Did the sureties, by agreeing to the state court judgment "in form and substance", waive the right to assert their surety claims in bankruptcy court?

(3) Did the district court err in finding the agreed judgment and settlement in the state court action ambiguous?

(4) Did the bankruptcy and district courts clearly err in finding that the parties to the state court suit intended the City's settlement to be allocated solely to recovery on Dodson's tort claims?

(5) If some portion of the settlement proceeds are allocable to recovery of Dodson's contract with the City, how much?

(6) Do the sureties' rights cover proceeds of the settlement whether or not characterized as tort recovery, because they "grew out of" Dodson's construction contract with the City?

(7) Does MBank or do the sureties have a prior secured claim to some or all of the proceeds based on their respective contract rights?

We do not reach the last two of these issues, because our answer to the first five questions requires a reversal and remand to the bankruptcy court.

(1) Does *res judicata* or collateral estoppel arise from the state court's order denying MBank's motion to intervene and preclude its assertion of a lien claim in bankruptcy court?

Answer: No.

Appellees contend that we must infer that because one line of Dodson's pleading opposing MBank's motion to intervene in state court alleged vaguely that MBank had no right to do so, the state trial court therefore definitively decided MBank's lien rights. This contention is patently incorrect. We apply the same standard of collateral estoppel that would be used in state court to

determine the preclusive effect of one of its judgments.[1]  Texas law holds that issues of fact actually litigated and determined in one lawsuit are binding on the same parties to a later suit.  *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627 (Tex.1992).

There is simply no evidence in the state court pleadings that the court made any such decision. It issued no opinion.  Significantly, the balance of Dodson's pleading in opposition to intervention seems to assert that MBank had no rights beyond those of Dodson itself, a contention that says nothing about the extent of MBank's lien rights.  Accordingly, whether or not MBank should have chosen to appeal this ruling is irrelevant.  The state court's order neither expressly nor by necessary implication adjudicated the extent of MBank's lien rights.  That order did not preclude MBank's filing a motion to determine lien rights in the bankruptcy court.

Almost as an aside, appellees also assert that the bank's pleading that vaguely objected to the specific language of the settlement, a pleading filed but not pursued when the trustee's motion for approval to compromise was pending before the bankruptcy court, waived its rights to challenge the characterization of the proceeds later.  We disagree.  The point of the compromise and settlement agreement was to bring money into the bankruptcy estate while reserving the parties' rights to argue later over ownership of the proceeds.  In this instance, the bank's "objection" seems from the record taken as a whole to have been treated by the parties as a reservation of the bank's right to contest ownership of the settlement proceeds.  Appellees do not appear to have urged waiver on this basis in the bankruptcy court, and the bankruptcy court certainly did not rely on this proposition.  Given the state of the bankruptcy court record, we also decline to do so.

(2) Did the sureties, by agreeing to the state court judgment "in form and substance", waive the right to assert their surety claims in bankruptcy court?

Answer:  No.

Appellees contend that under a rule of *res judicata,* or claim preclusion, UPIC was bound by its failure to have raised a compulsory counterclaim in the state court proceedings that would have adjudicated the sureties' lien and other rights against Troy Dodson.  Texas law governs the preclusive

---

[1]*Steph v. Scott,* 840 F.2d 267, 270 (5th Cir.1988);  28 U.S.C. § 1738.

effect to be given by this court to a Texas state court judgment. *Steph v. Scott, supra* n. 1. Consistent with the rule of claim preclusion in federal courts[2], Texas has recently adopted the concept that a party to litigation must assert all claims arising out of the same transaction. *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992), overruling *Griffin v. Holiday Inns,* 496 S.W.2d 535, 537 (Tex.1973). Under current Texas law, any cause of action which arises out of the facts involved in litigation must be asserted to avoid the risk of being barred from litigation in a subsequent suit. *Id.*

Applied in this case, *Barr* requires that the sureties' lien interests must have been connected with the same transaction or occurrence on which the City sued. Herein lies the flaw in appellees' argument. The City of Beaumont impleaded UPIC as a third party defendant in the state court case not to determine the extent of UPIC's lien interests in the account owed to Troy Dodson, but to make the City's own claim against the surety bonds. Troy Dodson likewise made no claim in the state court suit against the sureties regarding the extent of their lien interests. Consequently, UPIC was not required to assert in the lawsuit lien interests in the proceeds owed by the City. Neither the issues raised in the state court suit nor the sureties' legal posture in that lawsuit required them to assert the extent of their lien interests as a cross-claim against Troy Dodson. No preclusion doctrine prevented the sureties from later asserting their lien rights in the bankruptcy case. *Byrom v. Pendley,* 717 S.W.2d 602, 606 (Tex.1986).[3]

(3) Did the district court err in finding the agreed judgment and settlement in the state court action ambiguous?

Answer: No.

The bankruptcy court stated in Finding of Fact No. 6:

---

[2]*Nilsen v. City of Moss Point,* 701 F.2d 556, 559 (5th Cir.1983) (*en banc* ).

[3]Appellees also seem to argue that by agreeing to the state court judgment "in form and substance," the sureties may have waived any later challenge to the characterization of proceeds paid under that judgment. We disagree. If the judgment had clearly and unambiguously characterized the proceeds one way or another, an argument for judicial estoppel might have prevailed. Even the appellees no longer contend, however, that the judgment and settlement agreement in the state court were ambiguous. Signalling their approval of an ambiguous judgment could not enlarge that judgment beyond its scope or predestine how it would be later interpreted.

> The judgment awarded damages for tortious acts on the part of the City of Beaumont, et al, including misstatements, libel and slander, negligence, breach of duty of good faith and fair dealing, misfeasance, and other similar allegations of tortious acts; and awarded no damages for any other claims of the debtor including any claims for breach of contract, failure to pay money owed for construction work performed, or for failure to pay retainages on City construction projects, or any other claims sounding in contract or quantum meruit or arising in connection with the construction contracts with the City of Beaumont.

In its conclusions of law, the bankruptcy court states that this finding may be supported either by reference to the testimony, or lack of testimony, presented by appellants, or by the terms of the judgment and settlement themselves.

For purposes of determining ambiguity, we look to the judgment and settlement agreement and must conclude, as did the district court, that those documents are extremely ambiguous. There is no question that Troy Dodson's third amended petition in state court stated causes of action founded in contract as well as tort against the City and its employees. The compromise and settlement agreement pertaining to the state court suit avers the parties' "desire to compromise and settle all matters in controversy between them," pursuant to which, the City agrees to pay money "as the result of the allegations of libel, slander, misstatements, breaches of duty and negligence being made by plaintiff ..." The misstatements, breaches of duty and negligence could pertain either to Troy Dodson's tort or contract causes of action as pled in plaintiff's third amended petition. Further, in the parties' final judgment they agreed to "settle all matters in controversy"—not simply the libel and slander allegations—and the "wrongful acts" alleged on the part of the City are said to include "misstatements, libel and slander, negligence, breach of duty of good faith and fair dealing, misfeasance, and other similar allegations of wrongful acts...." The causes of action for negligence and breach of duty of good faith and fair dealing presuppose *the existence of a contract,* and misstatements were pled by Troy Dodson in connection with the breach of contract and quantum meruit allegations in plaintiff's third amended petition. The judgment and settlement agreement alone utterly fail to support the bankruptcy court's Finding of Fact No. 6 that no damages were paid in the settlement attributed to any contract-related or quantum meruit claims of Troy Dodson. The

documents are at least ambiguous.[4]

> (4) Did the bankruptcy and district courts clearly err in finding that the parties to the state court suit intended the City's settlement to be allocated solely to recovery on Dodson's tort claims?
>
> Answer:  Yes.
>
> (5) If some portion of the settlement proceeds are allocable to recovery of Dodson's contract with the City, how much?
>
> Answer:  $150,000.

 The bankruptcy court's interpretation of the settlement agreement relies on two key facts: that the trustee "adopted" the position of appellees in this case, although he did not testify;  and that testimony proffered by appellants to show that the City paid its share of settlement proceeds from a bond fund dedicated to street construction projects and that the City owed Troy Dodson money for the construction project at the time of settlement were irrelevant to the parties' intent.  The court also "held it against appellants" that they did not offer testimony from the lawyers who negotiated settlement of the state court suit.[5]

This court does not lightly reverse a trial court's finding of fact as clearly erroneous.  We may only do so if we have a firm and definite conviction that a mistake has been made.  *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).  We are convinced that such an error occurred here.

 In this case, the bankruptcy court discounted all but testimonial evidence, suggesting that the "intent of the parties" could be gleaned only by testimony of the attorneys who executed the state court judgment and settlement agreement.  This is incorrect.  Other probative evidence could also be considered in determining the parties' intent.  The state court agreed judgment, being a contract, was

---

[4]One might argue that despite the "whereas" clauses, which artfully rely mostly upon Dodson's tort claims, the judgment and settlement agreement, by expressly resolving *all* matters in controversy, unambiguously included the contract claims.  Even so, extrinsic evidence of the sort considered *infra* would have been necessary to determine the allocation of settlement proceeds between the contract and tort claims.

[5]The district court rendered a purely perfunctory conclusion that the bankruptcy court's characterization of the settlement proceeds was not clearly erroneous.  Because the district court's reasoning is not elaborated, we do not discuss it further.

subject to the ordinary rules of contract construction. *Northshore Laboratories Corp. v. Cowen,* 721 F.2d 514, 518 (5th Cir.1983). Evidence necessary to interpret an ambiguous contract may include testimonial evidence, business records, documentary proof and, in the case of a judgment, evidence of the parties' pleadings. *Id.* at 519-21.

Here, the testimony unequivocally established that the City's $150,000 cash contribution to the settlement was made from its fund for street construction projects. Under Texas law, bond proceeds must be expended for the purposes for which they were issued. *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975, 978 (1936). Had the City's payment in settlement been devoted only to Troy Dodson's libel and slander claims, a payment from the bond fund would be *ultra vires.* This evidence was not, as the bankruptcy court found, irrelevant to interpreting the City's settlement intent.

Further, the trustee's "adoption" of the position of the appellees hardly settles the matter, as the bankruptcy court believed. It is not clear that a trustee could ethically agree to shortchange one set of creditors' interests in the debtor's estate even in order to improve the unsecured creditors' position. The trustee owes a fiduciary duty to *all* the creditors, not just to the unsecured creditors. While he is entitled to litigate to determine the extent and priority of liens, he should not use his power unilaterally to manipulate the characterization of proceeds due from a third party and prevent lien claimants from obtaining rights to their share. The trustee assumes control over the debtor's estate subject to the rights that various creditors, such as MBank and the sureties, held before bankruptcy.[6] The trustee was not here enforcing against the lien creditors any unique bankruptcy device for lien avoidance, such as 11 U.S.C. § 547 preference avoidance; his rights are thus governed solely by contracts and security instruments held by those creditors, and by the nature of the lawsuit Dodson filed in state court against the City. Neither the trustee nor appellees have pointed to any provision of these underlying documents that permitted them deliberately to ignore the contract claims made against the City, and in essence, to decline to collect the account receivable owed by the

---

[6]MBank, of course, gained certain additional rights as a post-petition lender.

City.[7] Consequently, we will not interpret the trustee's "adoption" of appellees' position to suggest that he deliberately intended to undermine the claims of UPIC or MBank. His "adoption", unexplained by further testimony, is not inconsistent with a recognition that at least some of the settlement proceeds bore upon Troy Dodson's contract claims with the City.

In short, we agree that UPIC and MBank had the burden to prove the extent of settlement proceeds to which their liens attached. The undisputed testimony they adduced showed that the City owed Troy Dodson money on the Phelan Boulevard construction contract and that in settling the case, it paid at least $150,000 from a bond fund devoted to street construction projects. The conclusion is inescapable that at least $150,000 of the settlement was attributed to Troy Dodson's contract claims against the City. The bankruptcy court clearly erred in failing to attribute $150,000 of the settlement to the contract claims of Troy Dodson.

CONCLUSION

Because we have found the bankruptcy court's finding clearly erroneous to the extent of the $150,000 portion of the settlement proceeds paid by the City, and we have found these proceeds attributable to the Troy Dodson contract claims, there remain the questions of lien priority and allocation that we described above as questions 6 and 7. Appellees have not addressed those questions on the merits, and neither of the lower courts has had the opportunity to consider and evaluate those claims in the first instance. In this setting, it is prudent for us to remand for these allocational questions to be decided in the first by the bankruptcy court. The court's determination of the extent and priority of liens claimed by MBank and the sureties will be based on an assumption that the $150,000 of the settlement was devoted to contract claims, while the remainder compensated Troy Dodson for certain tort recoveries. We express no opinion on the merits of the appellees', sureties' or MBank's entitlement to all or any portion of the proceeds.

The judgment of the bankruptcy and district courts are REVERSED and REMANDED for further proceedings.

---

[7]They might have been *unable* to recover on the contract if it had been shown that Troy Dodson breached his contract with the City, but this was not done. Instead, the parties settled *all* claims existing between them.